IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 02-02887 (ESL) |
| REDONDO CONSTRUCTION CORPORATION | CHAPTER 11 |
| Debtor | |

## **OPINION AND ORDER**

This case is before the court upon *Debtor's Position as to Overpayment to Lord under the 15% Footnote Provision of the Supplement to Plan of Reorganization at Docket No. 1017* filed by Redondo Construction Corporation (hereinafter referred to as the "Debtor" or "Redondo") and the *Opposition to Debtor's Position as to Alleged Overpayment under the 15% Footnote Provision* filed by Continental Lord, Inc. (hereinafter referred to as "CLI" or "Lord") (Docket Nos. 2627 & 2629) and the reply and sur reply regarding this issue which were subsequently filed by the Debtor and Lord (Docket Nos. 2636, 2643). In addition, before the court is *Remodelco, Inc.'s Motion to Join Continental Lord's Motion (Docket No. 2559) and Requesting Reopening of Chapter 11 Case under 11 U.S.C. §350(b)* and the *Debtor's Objection to Remodelco's Claim for Interest Payment* (Docket No. 2644). Also, before the court is the *Debtor's Renewed Objection to Reopening of the Case upon Recent Arguments Presented by Lord at Docket 2643* (Docket No. 2645) and Lord's opposition (Docket No. 2647). For the reasons stated below, the court denies *Debtor's Position as to Overpayment to Lord Under the 15% Footnote Provision of the Supplement to Plan of Reorganization at Docket No. 1017* (Docket No. 2627) and grants in part and denies in part, Lord's *Opposition to Debtor's Position as to Alleged Overpayment Under the 15% Footnote Provision* (Docket No. 2629). The court denies Debtor's *Objection to Remodelco's Claim for Interest Payment* (Docket No. 2644). The court denies *Debtor's Renewed*

*Objection to Reopening of the Case Upon Recent Arguments Presented by Lord at Dkt. 2643* (Docket No. 2645).

### Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A). Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

### Procedural Background

The travel of this particular case is not only extensive but convoluted. On June 13, 2017, the court, as part of its *Order Clarifying Nature of Hearing* (Docket No. 2614) included the procedural background regarding the issue of Lord's pass-through claim and the treatment that this pass-through claim has been afforded by the Debtor throughout the bankruptcy case and in adversary proceeding 03-00194. The court incorporates said procedural background in order to better understand this particular issue, the context that the same has in relation to the history of the case, and its relationship with the adversary proceeding. In order to better understand a case or a story, the same must be told from the very beginning. This is the procedural background that was included in the above referenced Order:

"The Debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on March 19, 2002. On June 18, 2002, Lord filed claim #139-1 for construction contracts performed on May 28, 1990- March 31, 2001 in the amount of $2,632,614.53. Lord's claim was filed as an unsecured claim. On December 23, 2003, the Debtor filed an adversary proceeding against the Puerto Rico Highway Authority ("PRHA") for recovery of monies and property for extra work orders for the PR 2 Mayaguez project in the total amount of $9,211,902.67, of which $1,831,085 was allocated to claims of subcontractors, and $3,985,499.95 was allocated to interest from November 1999 to November 30, 2003 (Adversary proceeding No. 03-00194, Dkt #1, pg. 5). On August 26, 2005, the Debtor filed *Objections to Claims* in which it included Lord's claim as part of a spreadsheet in which it disclosed that the amount expected to be allowed was in the amount of $131,273 and the amount disallowed was $2,501,341 (Docket No. 1119). On October 6, 2005, the Court granted the Debtor's objections to the claims to which no opposition had been filed (Docket No. 1210).

On October 6, 2005, the Court confirmed the Debtor's Chapter 11 Plan of Reorganization (Docket No. 879), which was supplemented on February 17, 2005 (Docket No. 1017), and further amended on September 30, 2005 (Docket No.

1180) (Docket No. 1209). The Debtor also filed a *Supplement to First Amended Disclosure Statement* amending Exhibit C which is a list of the proof of claims filed against Debtor, in particular the amount expected to be allowed for Continental Lord's claim was amended to $157,509.15 (Docket No. 1016). The Debtor's Plan of Reorganization had 10 classes of claims. Class 8 consisted of the allowed general unsecured claims, which were estimated in the amount of $24,345,650 (Docket No. 879, pgs. 17, 51-52). The amended distribution of the claimants of Class 8 was as follows, "[h]olders of [a]llowed [g]eneral [u]nsecured [c]laims shall receive their pro-rata share of the funds available for distribution from the Litigation Trust, plus interest at the rate of two percent (2%) per annum from the Confirmation Date until full payment of their claims, plus interest at the rate of one percent (1%) per annum for the period from the Petition Date to the Confirmation Date; it being understood that after the realization of Debtor's Claims and Causes of Action the Litigation Trust Board of Supervisors will conduct an evaluation of the resulting proceeds and depending on the available balance to Equity Holders will decide if an additional one percent (1%) in interest is to be paid for the period from the Petition Date to the Confirmation Date as provided in Section 5.6 below, provided that under no circumstances shall the holders of Allowed General Unsecured Claims against Debtor receive in excess of 100% of the amount of such holders' Allowed General Unsecured Claims. Any such excess recoveries shall revest in Debtor or the Reorganized Debtor. Class 8 claims will be paid within two (2) years from the Effective Date" (Docket No. 1017, Exhibit A). Retention of Jurisdiction is covered by Article XI[1] of the Plan (Docket No. 879, pgs. 68-69).

As part of its Plan of Reorganization, the Debtor filed its Proof of Claims Reconciliation (Docket No. 879, Exhibit C) in which it listed Lord's claim in the amount of $2,632,615 and the expected amount to be allowed of $131,273. It also listed BBV- Argentaria's claim #107 in the amount of $2,732,178 and the expected

---

[1] Article XI of the First Amended Plan of Reorganization, titled Retention of Jurisdiction states:
"Retention of Jurisdiction. After the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of the following specified matters arising out of, and related to the Bankruptcy Case and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code:

    a) To hear and determine any and all obligations to the allowance of any Claims or any controversies as to the classification of any Claims or estimate any Disputed Claim;
    b) To hear and determine any and all applications by Professionals for compensation and reimbursement of expenses pursuant to Section 2.2(c) hereof;
    c) To hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;
    d) To hear and determine any and all pending applications, motions, adversary proceedings and contested or litigated matters pending before the Bankruptcy Court on the Confirmation Date;
    e) To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan, including but not limited to the Litigation Trust Agreement;
    f) To enforce the provisions of the Plan subject to the terms thereof;
    g) To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, the Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;
    h) To determine such other matters as may be provided for in the Confirmation Order" (Docket No. 879, pg. 69).

amount to be allowed is listed as -- which is $0. Desarrolladora Piloto, S.E. bought BBV's proof of claim #107 (Docket Nos. 302, 317). On October 5, 2005, Desarrolladora Piloto, S.E. filed its ballot accepting the Debtor's Plan (Docket no. 1198). On October 10, 2005, Desarrolladora Piloto, S.E. bought General Electric Capital Corporation's claim #192 which was amended on June 30, 2004 (proof of claim #287) (Docket No. 1224; See also Docket Nos. 1313, 1344, 1385 and 1660). Pursuant to the Debtor's proof of claims reconciliation, General Electric Capital Corp of PR's claim #192 is listed in the amount of $14,406,305 and the expected amount to be allowed is – which is $0. The claims reconciliation schedule also lists GE Capital claim #287 in the amount of $2,704,007 and the expected amount allowed is $592,765 (Docket No. 879, pg. 244). Exhibit F of the Plan of Reorganization includes a Proof of Claims Reconciliation which lists the amount of $5,782,836 expected to be allowed for claimant Desarrollo Piloto, S.E. (Docket No. 879, pg. 264). The Plan's supplement also included an amended Estate's Claims and Causes of Actions which forms part of the Schedule of Plan Documents. The PR-2 Mayaguez project is included as part of the Estate's claims and causes of action. There is a footnote 1 next to the PR-2 Mayaguez project that reads as follows: "[a]s per an agreement of August 15, 1994, as amended, with Continental Lord, Inc. ("CLI"), CLI is entitled to a 15% pass through from the recovery by Debtor, less proportioned expenses" (Docket No. 1017).

Subsequently, in the adversary proceedings, the Plaintiff/Debtor filed its *Post-Trial Memorandum* on November 9, 2007 and provided a summary as to the PR-2 Mayaguez project (Adversary proceedings #03-00192, 03-00194, 00195, Docket No. 145, pgs. 9-24, Docket No. 115, and Docket No. 112). The Plaintiff in its post-trial memorandum states that, "Lord's and Remodelco's claims against RCC are included in Joint Ex 41, in accordance to Section 109.04 of the Blue Book. They are the only two subcontractors with claims (EX 68)(Tr. Of 2/14/07, pp. 658-659, 668-691; Tr. Of 7/02/07, pp. 1242-1243)" (Adversary proceeding No. 03-00192, Docket No. 145, pg. 17-18). The Debtor/Plaintiff breaks down the amounts owed by the PRHA for the PR-2 Mayaguez project and includes a line item for Claims for subcontractors for Lord in the amount of $1,746,085 and for Remodelco in the amount of $85,000 for a total of $1,831,085 (Adversary proceeding, Docket No. 145, pgs. 20-21). The claims of subcontractors are included as part of the total claim values of $11,565,959.94 which is the figure used to calculate the interest amount of $4,621,947.72. The Plaintiff/Debtor concludes that, "[n]otwithstading RCC's demands for the amounts owed thereto and its two subcontractors under the contract, PRHA to date, more than 13 years after the substantial completion of the project, is still to proceed with its liquidation and as a consequence, has failed to pay RCC the items claimed to be due under the contract" (Adversary proceeding No. 03-00192, Docket No. 145, pgs. 24).

The final decree was entered on August 29, 2008 (Docket Nos. 1799, 1964, 1965). Litigation continued for various years as to these adversary proceedings; namely, 03-00192, 03-00194 and 03-00195. On July 12, 2012, the Litigation Trust paid Lord's "pass through claim" of $1,746,085 (the principal amount) and rendered a check to Lord in the amount of $1,395,381 after deducting legal fees and

-4-

administrative expenses (Docket No. 2559, Exhibit 3). The check (which is dated 07/16/2012) in the memo portion at the bottom left hand corner states, "Pass thru claim PR#2 Mayaguez Job."

On July 17, 201[5], Arrieta Construction Group, Inc. ("ACGI"), by its President Roberto A. Arrieta, submitted its *Final Report* (Docket No. 2553-1). ACGI was the administrator of the Litigation Trust which was established for the benefit of the Litigation Trust Beneficiaries. The Litigation Trust terminated on July 1, 2015 by its terms. The Final Report states that, "[o]nly RCC's general unsecured creditors remain with partial claims subject to distribution. Under the Plan, the Litigation Trust was to be funded by the transfer of all of RCC's funds, Claims and Causes of Action for the satisfaction of, among others, general unsecured creditors and professionals." (Docket No. 2553-1, pg. 1).   ACGI provided a breakdown of the distributions by year. ACGI stated that, "[i]n July 2012, RCC was allowed to withdraw funds from those deposited with the District Court after the USCA First Circuit determined that the only issues pending were the rate of interest to be awarded RCC, if any, and the period of time as to which it should be applied.  This matter was remanded to the District Court and subsequently to this Court. With the collection of the principal amount awarded the Litigation Trust was able to make further distributions" (Docket No. 2253, pg. 9). As to the year 2012 the distributions to the unsecured creditors were the following: "Distribution-#3: On July 21, 2012, the Litigation Trust distributed $7,235,372 to unsecured creditors; Distribution-#4: On July 23, 2012, the Litigation Trust distributed $8,811,574 to unsecured creditors; and Distribution #5: On November 30, 2012, the Litigation Trust distributed $488,000 to unsecured creditors" (Docket No. 2553-1, pg. 9). Moreover, ACGI, in its Final Report also informed that, "[a]s of July 1, 2015, the Litigation Trust had distributed **$19,794,382** and that also as of July 1, 2015 (excluding Las Vistas and two pass-through claims in case USCA #15-01397), **72.48%** of the unsecured creditors' claims had been paid. The remaining amount to be paid to unsecured creditors is **$5,485,888**. However, if Las Vistas (due to particular treatment of its claim), Continental Lord and Remodelco (both pass through claims in Case No. 15-01397) are included, the total due to creditors by RCC is **$9,092,097**" (Docket No. 2553-1, pg. 10). It further states that, "All Priority Tax Claims, Class 1-Priority claims, Class 2 Doral, Class 4 Liberty, Class 4 SeaBoard, Class 7 Travelers, and Convenience Claims have been paid in full." (Docket No. 1553-1, pg. 10). The Litigation Trust Administrator informed that, "[i]f the cases are affirmed on appeal RCC will be finally entitled to sufficient funds to pay all creditors with a substantial balance for RCC's shareholders." Lastly, the Litigation Trust administrator informed that since the Litigation Trust ceased on July 1, 2015 and that as a result, RCC's shareholders assumed the administration and the pending implementation and consummation of the Plan. Moreover, "…at the request of RCC's shareholders, the Administrator transmitted the necessary documents indicating thereto the balance due each unsecured creditor and their mailing addresses. Additionally, the Administrator provided RCC's shareholders with all banking information and custody of the Litigation Trust and RCC banking accounts" (Docket No. 2553-1, pg. 11). As of September 17, 2015, the only matters pending were the appeals before the U.S. Court of

Appeals for the First Circuit in cases number 15-1817 and 15-1822 (Docket No. 2557).

On April 21, 2016 Judgment was entered in adversary proceedings No. 03-00192, 03-00194 and 03-00195 in favor of Plaintiff, in the amount of $9,923,567.43, plus the interest accrued over said amount, less any applicable fees; and in favor of the PRHA, the remaining balance (Adversary Proceeding No. 03-00192, Docket No. 395, Adv. Proc. No. 03-00194, Docket No.366, Adv. Proc. No. 03-00195, Docket No. 345). On April 28, 2016, Lord filed an *Urgent Motion Requesting Funds Be Not Disbursed* given that a controversy had arisen between Debtor and Lord which makes Lord believe that if such money is disbursed to Debtor, Lord will never be paid (Adv. Proc. No. 03-00192, Docket No. 398). Lord included as an Exhibit, Attorney Cuprill's Memorandum regarding the distribution of funds which is dated April 22, 2016. On April 29, 2016, the Debtor filed its *Objection to Urgent Motion Requesting Funds Be Not Disbursed* arguing that: (i) "[c]ontrary to Lord's assertions the computation of the interest which may be due Lord was not made by the undersigned counsel but by Luis R. Carrasquillo, CPA, on the basis of certain information provided by Eng. Roberto Arrieta, which is being revised to correct certain errors included therein, pertaining to what Lord is entitled to pursuant to the provisions of RCC's confirmed plan (the "Plan"), as supplemented on February 16, 2005;" (ii) "[t]his Court lacks jurisdiction to involve itself in any dispute which may exist between Lord and RCC as to what Lord may be entitled to, a matter which at this juncture involves speculation on Lord's part and is totally premature. Lord has no standing to raise any issues in adversary number 03-00194 as Lord is not a party thereto, thus not being entitled to the remedy which it seeks;" (iii) the Urgent Motion requests the reopening of the Chapter 11 case pursuant to 11 U.S.C. §350(b); (iv) "… RCC will comply with its obligations to Lord pursuant to the provisions of the confirmed plan as supplemented, once the correct computation of the amount due Lord is accomplished;" and (v) "[t]o this effect, the Supplement provides in its footnote number 1 that Lord is entitled to a pass through claim from the recovery by Debtor in adversary number 03-00194 of 15%, less proportioned expenses. Once the correct amount is computed and RCC receives the funds awarded by this Court, RCC will fully comply with its obligations under the confirmed Plan (Docket No. 107 in the main case, Exhibit A hereto)" (Adv. Proc. No. 03-00192, Docket No. 399). On April 29, 2016, the Court ordered as follows: "[t]he urgent motion filed by Continental Lord, Inc. (docket #398) is hereby denied, for the reasons stated by Plaintiff/Debtor Redondo Construction Corporation (docket #399), which the court adopts. Moreover, the motion fails to plead with particularity the facts leading to its conclusory statements, and fails to include the legal basis for the same" (Docket No. 400).

On June 28, 2016, Lord filed its *Motion Requesting Reopening of Chapter 11 Case Under 11 USCA §350(b)* (Docket No. 2559). On July 21, 2016, the Debtor filed a *Motion Requesting Extension of Time to Submit Debtor's Objection to Motion Requesting Extension of Time to Submit Debtor's Objection to Motion Requesting Reopening of Case* (Docket No. 2568). On August 23, 2016, the Debtor filed its *Objection to Motion Requesting Reopening the Case Filed by Lord* (Docket No.

2572). On September 29, 2016, Lord filed its *Reply to Debtor's Objection to Lord's Motion under 11 U.S.C. §350(b)* (Docket No. 2574). On October 21, 2016, the Debtor filed its *Response to Lord's Motion at Dkt 2574 and Debtor's Reinstatement in Opposition to the Reopening of this Case for Lack of Cause* (Docket No. 2576). On November 2, 2016, Lord filed its *Response to Debtor's Response at Docket 2574* (Docket No. 2577).

A hearing was held on January 18, 2017 in which the Court ordered as follows: "1- For the reasons stated in open court, the motion to reopen filed by Continental Lord, Inc. (Dkt. #2559) is hereby granted. The same is based on interpreting the binding terms of the confirmed plan as they relate to the payment of amounts owed to Continental. The court notes that substantial litigation has occurred since the entry of the final decree on August 29, 2008 (#1965). 2- Continental Lord, Inc. shall file within 21 days an explicative motion as to how it calculated that the amount of $1,336,779 is owed. 3-The debtor shall file a motion within 21 days detailing how the amount of $9,923,567.43 was distributed by the debtor (re AP No. 03-00192, 03-00194 and 03-00195)" (Docket No. 2582).

On February 8, 2017, Lord filed its *Motion in Compliance with Order* (Docket No. 2587). On February 17, 2017, the Debtor filed its *Motion in Compliance with Order* (Docket No. 2590). On February 27, 2017, Lord filed its *Objection to 'Motion in Compliance with Order' at Docket 2590* (Docket No. 2592). On March 20, 2017, the Debtor filed an *Objection to Lord's Motion Requesting to Strike Portions of Debtor's Motion in Compliance with Order and Requesting an Evidentiary Hearing* (Docket No. 2594). Subsequently on March 31, 2017, the Court ordered the scheduling for a hearing on June 14, 2017 to consider the following: Lord's *Motion in Compliance with court order* (#2587); Debtor's Motion in compliance with court order (#2590); Lord's objection to Motion in compliance filed by the Debtor (#2592) and Lord's motion requesting leave to file a reply (#2595) (Docket No. 2601).

The *Motion for Entry of Order Clarifying Nature of Hearing Scheduled for June 14, 2017* (Docket No. 2612) filed by Debtor is denied and Lord's *Opposition to Motion for Entry of Order Clarifying Nature of Hearing Scheduled for June 14, 2017 filed by Debtor at Docket 2612 (Docket No. 2613)* is granted. The issues set forth in the minutes of the January 18, 2017 hearing remain open for determination. It behooves the parties to place the court in a position to adjudicate if any amounts are owed to Lord under the terms of the confirmed plan and the recoveries by the Litigation Trust; and subsequently by the Debtor upon the termination of the Litigation Trust on July 1, 2015" (Docket No. 2614, pgs. 2-9).

On June 28, 2017, the Debtor filed its *Position as to Overpayment to Lord under the 15% Footnote Provision of the Supplement to Plan of Reorganization at Docket No. 1017*, arguing the following: (i) "[i]t is a fact that the 2001 Amendment was superseded in January 2005, upon request by Lord and acceptance of the Litigation Trust Administrator, and most importantly as

included in the footnote incorporated to the Plan; (ii) Debtor's previous counsel, noted that pursuant to the 2005 amendment to the Pass Through Agreement Lord had been overpaid by the Litigation Trust Administrator (Docket No. 2627, Exhibit 3); (iii) that the payment made to CLI was made in error and that the Litigation Trust Administrator overpaid CLI. CLI was overpaid in the amount of at least $592,358.82 due to a payment in error by the Litigation Trust Administrator who did not follow the 2005 amendment to the Pass Through Agreement and the clear language of the footnote; (iv) "…the Litigation Trust Administrator overpaid Lord under the provisions of the 2001 amendment, when in fact if payment was to be made pursuant to the Exhibit to the Confirmed Plan as Supplemented included in the footnote the 2005 amendment it mandated payment strictly of 15% of the Debtor's recovery related to Lord's claim, less proportionate expenses. As calculated by the Debtor payment according to the footnote's language is for a lesser amount;" (v) Article 1795 of the Puerto Rico Civil Code ("PR Code"), 31 L.P.R.A. §5121, provides that, "[i]f a thing is received when there was no right to claim it and which, through an error, has been unduly delivered, there arises an obligation to restore the same;" (vi) CLI's payment of interest is not a payment under the confirmed plan as supplemented; either under Class 8 (which does not include payment of interest) nor a payment under an assumed contract (since the Pass Through Agreement was never listed in the Schedules, nor assumed by the Debtor); (vii) "Lord knew that it was been paid under the 2001 amendment and not under the 2005 amendment. Lord reaffirmed in this Bankruptcy Court the 2001 amendment however it did not recognize the overpayment received considering the 2005 amendment. Under this set of undisputed facts, Lord lacks good faith and cannot claim the doctrine of 'actos propios.' In order to claim this doctrine, Lord must have acted in good faith and have clean hands" (Docket No. 2627).

On July 11, 2017, CLI filed its *Opposition to Debtor's Position as to Alleged Overpayment Under the 15% Footnote Provision* contending the following: (i) "[f]or more than 12 years Debtor operated under the Plan following its agreement with Lord, pursuing Lord's claim, paying the principal amount of such claim and working on the amounts that should be paid as Lord's share

in the interest to be received;" (ii) Debtor alleges that its attorney, Mr. Cuprill, the Trust Administrator and all four (4) members of the Board of Supervisors made an error when they all agreed in July 2012 to pay Lord the principal amount adjudicated by this Court on August 31, 2009 to Lord (Adversary Proceeding Num. 03-00194, Docket No. 129, p. 41); (ii) the issue raised by the Debtor, "…for the first time in 12 years, has to be considered taking in consideration all of the provisions of the Liquidating Agreement, as amended. Debtor is ignoring the basic rule regarding incorporation by reference. The incorporation of a document by reference does not require sacramental words. Municipio de Mayaguez v. Lebrón, 167 D.P.R. 713, 722 (2006). Even a vague sentence referring to a document, plans and specifications is sufficient to incorporate by reference the entire document;" (iii) "[s]ince this Court's judgment of August 31, 2009 specifically and separately awarded to Lord in the amount of $1,764,085, such amount belongs entirely to Lord. That is the agreement recognized by the Debtor, its attorney, the Board of Supervisors (including the two (2) shareholders of Debtor) and the Trust Administrator. All of them did what is correct and supported by the Liquidating Agreement, as amended. Such distribution, made seven (7) years after the 2005 footnote incorporating to the Plan the Liquidating Agreement, as amended, constitutes the prevailing agreement between the Debtor and Lord;" (iv) Debtor's allegation that Lord's letter dated January 14, 2005 signed by Mr. Roberto Gorbea, prompted Debtor to file a Supplement to the confirmed Plan on February 2005 to include the footnote in Exhibit B to the Supplement to the Plan and that such actions should be interpreted 'strictly' as an amendment to the Liquidating Agreement is wrong. There was no such amendment to the Liquidating Agreement in 2005. "Mr. Gorbea's letter was sent with the sole purpose and intention to clarify and correct Lord's Proof of claim, which erroneously included Lord's claim for the PR-22 Mayaguez project claim. The correction in the Proof of Claim was necessary because Lord's claim was against the PRHTA and not against Debtor. Due to that error, Mr. Gorbea sent the letter to Mr. Cuprill requesting that such claim be excluded from the Proof of Claim since Lord's claim against the PRHTA passing-through Debtor, as stated before, and not a claim against Debtor;" (v) the Trust Administrator's Memorandum, "… demonstrate[s] that

the sole purpose and intention of Mr. Gorbea's letter was to clarify and correct the Proof of Claim by excluding Lord's claim for the PR-2 Mayaguez Project and suggested that it should be classified in another category, since said project was a pass-through claim against PRHTA and not against Debtor;" (Docket No. 2627, pg. 11); (vi) "Debtor is estopped from changing the position it has maintained with his own acts doctrine ('actos propios'), since during more than 12 years Debtor has assumed a conduct that earned the trust of Lord and created a legal and binding situation on which Lord relied and acted. Having Debtor assumed a position for more than 12 years and Lord rested and acted on such position, Debtor cannot now change and assume in 2017, a groundless position that is contrary to the position it had before, which change in position will cause economic prejudice to Lord;" (vii) "[t]he intention of the parties, specifically Lord, the Trust Administrator, as agent for Debtor, and Debtor's attorney have been consistent and contrary to Debtor's new position. Mr. Gorbea has never made any representation that would conceive a strict interpretation that Lord's right to any payment should be limited to a 15% of the recovery, regardless of the outcome;" (ix) "… the footnote included in Exhibit B was drafted by Debtor and Lord did not participate in such drafting. It is a general principle of law that the interpretation of obscure clauses of a contract shall not favor the party that caused the obscurity. Article 1240 of the P.R. Civil Code, 31 L.P.R.A. §3478;" (x) "…the alleged error in Debtor's payment to Lord is a fallacy since it never occurred. Therefore, there is no need to devote time to discuss court cases that are totally inapplicable to the matter at issue;" and (xi) the doctrine of judicial estoppel is applicable to Debtor's contradictory and groundless new position. "The allegations of Debtor in paragraph 18 attempt to convert Lord's claim as if it were a claim against Debtor. That is also a distortion of the facts since the Liquidating Agreement, as amended, the Trust Administrator's memorandum, Debtor's attorney memorandums and motions speak by themselves and demonstrate the true fact, i.e., that Lord's claim as to PR-2 Mayaguez project is not as a creditor of Debtor because its claim is against PRHTA and Debtor is a conduit of that claim. That is an undisputed fact and it is now, in 2017, that Debtor is creating for the first time an allegation that is contrary to everyone's acknowledgement that Lord is not a creditor" (Docket No. 2629).

-10-

On July 27, 2017, the Debtor filed its *Reply to Lord's Opposition to Debtor's Motion at Docket 2627 as to Overpayment pursuant to Footnote included in Exhibit to Amended Payment Plan* contending the following: (i) the Debtor reaffirms that judicial estoppel works both ways. "….the undisputed facts of this case show that Lord's acts do not sustain the right to receive what it received as payment under a contract which by terms of the Plan of Reorganization, was rejected. Second, Lord cannot allege judicial estoppel to defend an overpayment it knew was not the agreement between the parties, nor was sustained by the exact wording of the footnote. When the party alleging judicial estoppel knew that the facts upon which it alleged rights are based were in error, or contrary to what the agreement was, it cannot allege judicial estoppel. Furthermore, payments received in error are subject to be returned;" (ii) on April 29, 2016, the Debtor through prior counsel replied to the Urgent Motion in adversary proceedings 03-00192; 03-00194 and 03-00195 informed the court that Lord had been paid in excess (Adversary Proceeding No. 03-00192, Docket No. 399). The Court denied Lord's motion and ordered the disbursement of funds (Adversary Proceeding No. 03-00192, Docket No. 400); (iii) "[t]he Debtor distributed all funds received from the Litigation Trust under the provisions of the Amended Plan of Reorganization, as supplemented. All allowed general unsecured claims were paid 100% of their claim. No interest was to be paid to this class according to the terms of the confirmed plan. The remaining proceeds were received and used by the Reorganized Debtor;" (iv) the pre-petition Liquidating Agreement is an executory contract pursuant to 11 U.S.C. §365(a). The Debtor did not file a motion assuming the Liquidating Agreement with Lord and it also failed to assume the Liquidation Agreement explicitly through the plan. Therefore, the Liquidation Agreement was deemed rejected by the terms of the Plan of Reorganization and Lord did not object to the Plan nor moved for the assumption of the Liquidating Agreement; (v) the footnote in Exhibit B to the Supplement of the First Amended Plan, which relates to the list of the causes of action of the estate that will be turned over to the Litigation Trust, cannot be considered an attempt to assume the Liquidating Agreement; (vi) "…Lord received more than the amount of its Allowed Claim under the Plan. This was done by error of the Litigation Trust Administrator even though the

allowed claim under the confirmed plan was considerably lower. The amount paid was even more than the 15% provided by the footnote of the Plan;" (vii) in the alternative, if this Court determines that Lord is entitled to an additional payment of interest under the footnote, Lord cannot obtain relief aside from what is provided in the text of the footnote (15% of the award less proportionate costs and expenses); (viii) since the Liquidating Agreement was never assumed by the Debtor, the only right that Lord may claim is that under the terms of the alleged footnote. Thus, pursuant to 11 U.S.C. §1141(a), (b) and (c), the terms of the Plan are binding and the causes of action are property of the estate and vest on the reorganized debtor free and clear of all claims and interest, except for those provided by the confirmed plan. Therefore, Lord cannot claim more than the 15% granted by the footnote in the plan. Any interest Lord might have aside from the 15% recovery was stripped by the Plan; (ix) judicial estoppel is applicable to Lord's actions and inactions such as the following: (1) Lord failed to request that the Liquidating Agreement be assumed by the Debtor; (2) Lord failed to respond to the objection to claim #139; (3) Lord failed to object to the Disclosure Statement which did not disclose the existence of the Liquidating Agreement and its impact in the recovery of any award under adversary proceeding 03-00194; (4) Lord failed to object to the confirmation of the plan which included a provision that provided that all executory contracts not assumed by the Debtor were deemed rejected on the effective date; (5) Lord failed to formally request that its contingent pass through claim be classified separately; and (6) Lord failed to object to the language of the footnote that only preserved the right to receive 15% of the recovery, less proportionate expenses; and (x) the Debtor reaffirms its position as originally raised by prior counsel and restated in Debtor's motion at Docket No. 2627 which provides the computation of the overpayment made to Lord contrary to the provisions of the footnote (Docket No. 2636).

On August 15, 2017, CLI filed its *Sur-Reply to Debtor's Reply to Lord's Opposition to Debtor's Motion at Docket 2627* arguing the following: (i) the Liquidating Agreement is not an executory contract; (ii) Lord could not be a party in adversary proceeding 03-00194 because its claim was against PRHTA and Lord did not have a contract with PRHTA. The industry standard

is for recourse of the subcontractor to have the general contractor pass-thru the claim against the owner under a liquidating agreement; (iii) "Lord's claim pursuant to the Liquidating Agreement, as amended in 2001, and Adv. Proc. 03-00194 is not included in claim #139 and Lord has never been an unsecured Class 8 creditor for its claim;"(iv) Lord has two (2) different claims; namely one is based on the Liquidating Agreement, as amended in 2001, for the PR-2 Mayaguez Project which is contingent on Debtor obtaining a favorable judgment and receiving the funds from the PRHTA, and the second claim is #139 for other projects owed pre-petition by Debtor to Lord and which bear no relation to the projects litigated under Adv. Proc. 03-00194;" (v) on November 9, 2009, the Debtor in its post-trial memorandum as to the PR-2 Mayaguez Project stated that; "The Debtor/Plaintiff breaks down the amounts owed by the PRHA for the PR-2 Mayaguez project and includes a line item for Claims for subcontractors for Lord in the amount of $1,746,085 and for Remodelco in the amount of $85,000 for a total of $1,831,085;" (vi) on July 16, 2012, the Debtor issued the payment to Lord of the principal amount of $1,746,085 as agreed by the parties in the 2001 amendment to the Liquidating Agreement. The two shareholders of the Debtor and Debtor's attorney accepted and approved the payment of the principal amount. The check paying such amount has a note that states: "Pass Thru Claim PR #2 Mayaguez job" at Docket 2559-3; (vii) "…pursuant to the approval of such payment made in accordance with the amended Liquidating Agreement, Debtor, its two shareholders and Debtor's attorney recognized, accepted and ratified the Liquidating Agreement, as amended in 2001, as a valid and enforceable agreement. Such payment was also approved by this Honorable Court in 2015, when the Final Report of the Litigation Trust Administrator was submitted;" (viii) "[o]n April 22, 2016, Debtor's attorney Charles Cuprill sent a Memorandum to Debtor's shareholders, Lord and another subcontractor of Debtor (Dkt. #2559-6). Mr. Cuprill's Memorandum included an analysis of interest payments due to Lord and Remodelco as part of the award of the principal amount previously paid in the Mayaguez Project case. Referring to Lord and Remodelco, Cuprill stated that such computation is 'setting forth the percentage of their entitlements' and Mr. Gorbea['s] acceptance of the $1,336,799.03 amounts stated by Mr. Cuprill (Docket 2559, Exhibit 6);" (ix) "[r]egarding Debtor

attorney's motion, memorandum and acts, the First Circuit Court of Appeals has maintained that a party is bound by the expressions of its attorney. See In Lang v. Wal-Mart Stores East, L.P., 813 F. 3d 447 (1st Cir. 2013);" (x) "[i]t is inconceivable to allege now in 2017, after 13 years, that so many smart, experienced and capable persons made the alleged error. The true and real facts is that the 2017 new theory is fictitious and frivolous;" (xi) "[i]t was not necessary for Lord to take the action alleged by Debtor, since claim #139 did not include Lord's contingent claim against PRHA for works at the PR-2 Mayaguez Project, which at such time was being litigated under Adv. Proc. 03-00194. Everyone was operating and conducting themselves under the terms of the Liquidating Agreement, as amended in 2001, according to the Supplement of the First Amended Plan. The amount of claim 139 was an amount owed by Debtor at the time of filing its bankruptcy which was later corrected to exclude Lord's pass through claims against PRHA;" (xii) "…the funds obtained from Lord's claim in PR-2 Mayaguez Project do not fund the Debtor because Debtor is obliged to pay to Lord such funds when received from PRHA;" (xiii) there was no need to object to the language of footnote #1, or to the confirmation of the First Amended Plan, as supplemented, "… since it was a clear understanding among all the persons involved in this case from 2003 until 2016, including Debtor's two shareholders and Debtor's attorney, that the footnote incorporated into the Plan by reference the entire Liquidating Agreement, as amended in 2001, before the confirmation date of the Plan;" (xiv) the Final Report from the Trust Administrator submitted to the Court on July 17, 2015 and approved by the Court, disclosed that the payment for interests was still pending appeal at that time and recognized Lord's claim to receive the interest payment (Docket 2553-1, page 9); (xv) "Debtor alleges that on April 29, 2016, its prior counsel, Mr. Charles Cuprill replied to Lord's Urgent Motion and informed the court that, 'Lord had been paid in excess.' Such allegation is not true. Said statement does not appear in any place in Mr. Cuprill's motion (Docket 399) and it serves to induce to error;" (xvi) "… pursuant to Articles 7.8 and 7.10 of the Litigation Trust Agreement, the decision of the Administrator to pay Lord the principal amount and his enforcement of the Liquidation Agreement, as amended in 2001, is correct, conclusive and final;" (xvii) "[t]he interest awarded

by the Court on the principal amount paid by PRHA is part of the principal amount awarded by the Court to Lord in its August 31, 2009 Judgment and, therefore, it belongs to Lord. Under Puerto Rico law, the award of default prejudgment interest in construction work is, in the first instance a matter of contract. Puerto Rico law calls for the award of prejudgment default interest in contract cases and the award of that interest is integral to the judgment. Municipio de Mayaguez v. Rivera, 113 D.P.R. 467 (1982);" and (xviii) "… pursuant to the text of the Liquidating Agreement, as amended in 2001, and the August 31, 2009 Judgment of this Court, Lord's claim is against the PRHA and Lord is the owner of the beneficial interest of the amounts paid by the PRHA to cover Lord's claims. Debtor is a mere conduit that might only hold, at the most, the legal title, but not the beneficial interest of proceeds resulting from Lord's specific and contingent claim against the PRHA. Lord's claim against PRHA, passing through Debtor, is under a constructive trust with Debtor" (Docket No. 2643).

On August 30, 2017, the Debtor filed its *Objection to Remodelco's Claim for Interest Payment* premised upon the following: (i) Remodelco failed to file a proof of claim against the Debtor; (ii) the disclosure statement and confirmed plan failed to mention the existence of any liquidating pass-through agreement between the Debtor or Remodelco; (iii) the footnote in the supplement of the First Amended Plan only mentions Lord "with a 15% pass through claim," less proportionate expenses; (iv) Remodelco did not object the disbursement of the interest award in the adversary proceeding and failed to appear before June 2017 in the case; (v) Remodelco did not request by motion that any existing agreement be assumed as an executory contract; (vi) the Debtor did not classify Remodelco in Class 8 where it listed its other general unsecured creditors, suppliers and subcontractors; (vii) Remodelco has failed to submit copy of the purported agreement with its pleadings; (viii) the plan is binding on the Debtor and Remodelco. Remodelco never objected the confirmation of the Plan, nor requested that it be separately classified due to its pass through claim; (ix) pursuant to section 1141 and the prevailing case law, Remodelco is bound by the terms of the plan and the causes of action vested to the Debtor free and clear of its interest, thus the Debtor does not need to pay Remodelco on account of the interest award under

the terms of the Confirmed plan; and (x) Remodelco failed to properly prosecute its claim and preserve any right it may have with respect to the interest award. Its actions or inactions preclude Remodelco from asserting a claim against the Debtor at this juncture (Docket No. 2644).

On September 13, 2017, the Debtor filed its *Renewed Objection to Reopening of the Case Upon Recent Arguments Presented by Lord at Dkt. 2643* contending as follows: (i) "…Lord's position is that the award as a whole, including the interest award, is not property of the bankruptcy estate. This change in Lord's legal position divests this Honorable Court of any jurisdiction to consider Lord's claim for interests under the confirmed plan;" (ii) Lord's new position that the Liquidating Agreement is not an executory contract is a "… contradictory position to the arguments it used in order to request the reopening of the bankruptcy case, where it vehemently defended as the grounds for reopening the case that the Liquidating Agreement was an executory contract assumed by the Debtor through the footnote in the Supplement of the Amended Plan;" (iii) "… the only bankruptcy related nexus in Lord's request to reopen the case was that the Liquidating Agreement was an executory contract assumed by the Debtor and thus incorporated by the footnote in the Supplement to the Amended Plan;" (iv) "Lord's arguments now are more geared towards defending issues under non-bankruptcy law, i.e., the allowance of an interest award as an integral part of a judgment, the constructive trust theory and judicial estoppel. These are not core matters that require the expertise of the Bankruptcy Court, nor the interpretation of the Bankruptcy Code provisions or of the confirmed plan;" and (v) "[i]n order for a moving party to establish 'cause' it must demonstrate that there is compelling cause. Lord's request for relief is based on what it alleges is 'non-property of the estate' under a 'non-assumed' contract. The relief requested by Lord is not a relief to correct errors, make amendments to the confirmed plan or the need to enforce the plan and discharge. Therefore, there is no 'cause' under Lord's request to reopen this case" (Docket No. 2645).

On November 2, 2017, CLI filed its *Opposition to "Debtor's Renewed Objection to Reopening of the Case"* premised upon the following: (i) the issue of whether the Liquidating agreement is an executory contract was not the basis of the court's decision of having jurisdiction

to re-open the case as it was stated in at docket 2582; (ii) "… the Court reopened the case because it had jurisdiction to do so, based on the undisputed facts that occurred during more than 12 years, as demonstrated in Lord's motion and its Exhibits and on equitable principles;" (iii) on August 29, 2008, the Bankruptcy Court entered the final decree (Docket No. 1965) in which Article XI, Section 11.1 of Debtor's confirmed plan of reorganization by which this court retained jurisdiction under 11 U.S.C. §§105(a) and 1142 for several purposes detailed in the plan; (iv) the order reopening the case was notified more than seven (7) months ago, therefore the same is firm and final; (v) "[t]he undisputed facts prove that Lord has always stated and hereby restate and affirm that the provisions for payment to Lord under the Liquidating Agreement were specifically accepted and included by Debtor under the confirmed Plan and the actions of Debtor and its attorney during 12 years were in accordance with such agreement;" (vi) when Redondo and Lord agreed in the Liquidating Agreement to prosecute the litigation against the PRHTA, they created a relationship that should be considered as a constructive or express trust because said Agreement includes the following: (1) an express trust of Lord in Redondo for it to act as a conduit to prosecute Lord's claims against PRHTA; (2) to receive the payments made by PRHTA to cover Lord's principal amount claimed and interests thereon, and (3) to pay Lord any amounts received related to Lord's claim; (4) such amounts do not represent a payment to Redondo because Redondo is acting as a conduit between PRHTA and Lord regarding Lord's claim; (vii) the interest awarded is an integral part of said monetary claim, therefore said interests cannot be considered as part of the Debtor's estate pursuant to 11 U.S.C. §541(b) and (d) and the same is attached to the principal amount. Thus, Lord is the sole beneficiary of interest and Redondo is a mere conduit; (viii) whether the Liquidating Agreement is an executory contract is not pertinent because the Court already reopened the case based upon the amendment to the confirmed Plan; (viii) "[t]he interests awarded to Lord under the adversary proceeding (later disbursed to Debtor) is property of Lord and the amended and confirmed Plan created Debtor's obligation to pay it to Lord. This legal obligation was proposed by Debtor in an amendment to its Plan, accepted and confirmed a long time ago. As such, it is a matter under the Bankruptcy Code and the present

case;" (ix) Debtor's post-petition and post-confirmation actions treat Lord's pass-through agreement and claim as a valid one based on the incorporation of the obligations included in the Liquidating Agreement in Debtor's confirmed Plan. Such actions include: (1) the filing of the adversary proceeding including Lord's pass-through claim; (2) the footnote in the supplement incorporated the obligations under the Liquidating Agreement into the terms of a Plan that was subsequently confirmed; (3) the Litigation Trust Administrator's final report (Docket No. 2553) which disclosed that Lord and Remodelco as pass-through claimants. The administrator informed that if the pass-through claims and Las Vistas are added to the pending amounts to be paid, then the amount would not amount to $5,485,000, but it would be in the amount of $9,920,000; (4) the Litigation Trust Administrator made a check to Lord on July 16, 2012 for $1,385,381 in payment of the principal net amount of the pass through claim  (Docket No. 2559-3) which was made prior to the report; (5) the Litigation Trust administrator and the two (2) shareholders of the Debtor which were actively participating in the case recognized as valid the incorporation of the Liquidating Agreement in the confirmed Plan and this can be evidenced since they accepted and approved the July 16, 2012 payment to Lord (Docket 2559-4, Exhibit 4); (6) the Plan Administrator provided different scenarios of pending payments to the pass through claims (Docket No. 2559-6); (7) Debtor's former attorney memo recognizing that the interest amount of $1,336,799.03 should be payable to Lord and Mr. Gorbea's acceptance of that amount (Docket No. 2559-6 & 2559-7); (8) in adversary proceeding No. 03-00194, there is a post-trial report (Docket No. 115) in which it includes the payments of the pass through claims of Debtor's subcontractors; namely, Lord and Remodelco; and (x) Debtor's motion questioning this court's jurisdiction constitutes a collateral attack to this Court's decision which became final since February 2017 (Docket No. 2647).

On December 13, 2017, the Debtor filed a *Motion Requesting Leave to Reply and Reply to Lord's Objection to Renewed Objection to Reopening of the Case Upon Recent Arguments Presented by Lord at Dkt. 2643*, contending that: (i) Lord's change in its legal position divests the Bankruptcy Court of any jurisdiction to reopen the case. Lord now claims that: "…the

Liquidating Agreement is not an executory contract and that the same was assumed by the Debtor (Docket No. 2643, pg. 4. It further concluded that the Debtor is a mere conduit that might only hold, at the most, the legal title but not the beneficial interest of proceeds resulting from Lord's specific claim against PRHA (Docket No. 2643, pg. 17). Finally, it was reaffirmed that the award as a whole, including the interest award, is not property of the bankruptcy estate;" and (ii) there is no "cause" under 11 U.S.C. §350 to reopen the case (Docket No. 2648).

On December 22, 2017, CLI filed a *Motion to Strike* Debtor's motion at Docket No. 2648 because it is a repetition of the arguments concocted to further delay the resolution of the case. Debtor is trying to attack this court's determination to reopen the case, when it did not file a motion for reconsideration. CLI argues that the only pending matters before the Court are the following: (i) if pursuant to the confirmed plan, Lord is owed the interests of the principal amount already paid to Lord; and (ii) the amount of such interests (Docket No. 2649).

### *Discussion*

There are several legal issues before the court. The first issue is a renewed objection by the Debtor as to whether the court has jurisdiction to reopen the case under 11 U.S.C. §350. If the court has jurisdiction to reopen this case, the next issue that must be considered is whether the Liquidating Agreement, as amended, that was referenced in the footnote to the estate's claims and causes of action, constitutes an executory contract and the implications of this concept.  The court must also consider whether the doctrine of judicial estoppel, equitable estoppel and "actos propios" are applicable in the instant case. Lastly, the court will consider whether the doctrine of collection by mistake of what is not due ("cobro de lo indebido") is applicable to the instant case.

### *Renewed objection to reopen under 11 U.S.C. §350*

Fed. R. Bankr. P. 5010 provides in pertinent part that, "[a] case may be reopened on motion of the debtor or other party in interest pursuant to §350(b) of the Code." Section 350(b) provides that: "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. §350(b). The movant bears

the burden of demonstrating the grounds for reopening of a case. See In re Otto, 311 B.R. 43, 47 (Bakr. E.D. Pa. 2004); In re Carter, 38 B.R. 636, 638 (Bnakr. D. Conn. 1984). "The language of section 350(b) gives the court broad discretion in the reopening of a case." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 350.03 (16th ed. 2018); See also; Mass. Dept. of Revenue v. Crocker (In re Croker), 362 B.R. 49, 53 (1st Cir. B.A.P. 2007) citing In re McGuire, 299 B.R. 53, 55 (Bankr. D.R.I. 2003). "Reopening is supposed to be little more than an administrative function which is designed to resurrect closed files from the court's archives so that some type of request for relief can be received and acted upon. This is usually done in order to take care of some detail that was overlooked or left unfinished at the time the case was closed. It was not designed as an opportunity to create, and then enforce, rights that did not exist at the time the case was originally closed." Finch v. Coop (In re Finch), 378 B.R. 241, 246 (B.A.P. 8th Cir. 2007).  "However, the reopening of a case is a ministerial act which allows the file to be retrieved so the court can receive a new request for relief; the reopening by itself, has no independent legal significance and determines nothing with respect to the merits of the relief to be requested." Cadle Co. v. Andersen (In re Andersen), 2011 Bankr. Lexis 317, *14 (B.A.P. 1st Cir. 2011) citing In re Haralambous, 257 B.R. 697, 698 (Bankr. D. Conn. 2001); See also; Giddens v. Kreutzer (In re Kreutzer), 249 Fed. Appx. 727, 729 (10th Cir. 2007).

"While the Code does not define 'other cause' for purposes of reopening a case under section 350(b), the decision to reopen is discretionary with the court, which may consider numerous factors, including equitable concerns, and ought to emphasize substance over technical considerations." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 350.03[5](16th ed. 2018); See also; In re Dalezios, 507 B.R. 54, 58 (Bankr. D. Mass. 2014) ("The decision to reopen should be made on a case-by-case basis based on the particular circumstances and equities of the case, and should be left to the sole discretion of bankruptcy court."). "For

-20-

example, courts have granted motions to reopen a case to modify a reorganization plan, to interpret a provision in a previously confirmed plan and to determine the validity of a lien." Id. at ¶350.03[5]. Bankruptcy Courts generally consider a variety of factors when deciding when to reopen a case, such as:

> "[t]he length of time that the case was closed…; whether a non-bankruptcy forum, such as a state court, has the ability to determine the issue sought to be posed by the debtor…; whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the debtor seeks to achieve by reopening; and whether it is clear at the outset that the debtor would not be entitled to any relief after the case were reopened." Pingaro v. Ameriquest Mortg. Co. (In re Pingaro), 2008 Bankr. Lexis 3959, *7, 2008 WL 8664764 citing In re Otto, 311 B.R. at 47.

Moreover, a bankruptcy case should remain closed, "where it appears that [reopening the case] would be futile and a waste of judicial resources." See In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995). Further, when the purpose of reopening is to litigate issues that clearly have no merit, the matter should remain closed. See Arleaux v. Arleaux, 210 B.R. 148, 149 (B.A.P. 8th Cir. 1997); In re Rashid, 2004 U.S. Dist. Lexis 25032, 2004 WL 2861872.

The court reaffirms its prior holding (Docket No. 2582) to reopen this case pursuant to section 350(b) for "other cause," based upon the interpretation of the binding provisions of the confirmed plan, as supplemented (Docket Nos. 1016, 1017 and 1018), under the particular circumstances of the case and also the Debtor's contention regarding the subcontractor claims in adversary proceeding No. 03-00194. In retrospect, maybe a final decree should not have been entered on August 29, 2008, when there was substantial ongoing litigation in adversary proceeding number 03-00192, 03-00194 and 03-00195.

The court finds that it is important and relevant to disclose the origins of how "footnote 1" pertaining to Exhibit B (Estate's Claims and Causes of Actions) came into existence. The Debtor in the *Supplement to First Amended Disclosure Statement* disclosed that Exhibit C (a list

-21-

of the proof of claims filed against Debtor), in the row marked Claim No. 139 (Continental Lord), deleted the number "$131,273.00" in the column labeled "Amount expected to be allowed," and replaced it with "$157,509.15" (Docket No. 1016). The Debtor in its *Supplement to First Amended Plan of Reorganization* disclosed that: "1. The amendments to the Plan, as indicated in boldface, are attached hereto as Exhibit A. 2. The amendment to Item No. 3 (Estate's Claims and Causes of Actions) of the "Schedule of Plan Documents" annexed to the Plan is attached hereto as Exhibit B" (Docket No. 1017 as compared to Docket No. 879, pg. 171, Estate's Claims and Causes of Action in which there were no footnotes). The Debtor on February 17, 2005, filed a *Motion in Compliance with Order and Certificate of Mailing* stating that: "Debtor has amended the Plan in accordance with the Joint Motion, and both the Plan and Exhibit C of the Disclosure Statement in response to issues raised by Continental Lord, Inc. concerning its claim, as specifically set forth in the Supplements filed contemporaneously herewith, which are being served together as indicated in the certificate of service to this motion" (Docket No. 1018, pg. 1).

The Debtor's confirmed plan, Article XI, section 11.1 Retention of Jurisdiction, provides in pertinent part that after the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction pursuant to 11 U.S.C. §§105(a) and 1142 to: (e) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan, including but not limited to the Litigation Trust Agreement; (f) to enforce the provisions of the Plan subject to the terms thereof; and (g) to correct and defect, cure any omission, or reconcile any inconsistency in the Plan, the Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan (Docket Nos. 879, pgs. 68-69). Moreover, the Debtor made a particular request for retention of jurisdiction over specified matters as stated in Article XI of the first amended plan of reorganization which the

-22-

court granted on October 5, 2005 (Docket No. 1207). Therefore, the court has jurisdiction to consider the pending issues regarding the Liquidating Agreement.

The next step in our analysis is to determine whether the Liquidating Agreement that is referenced in footnote 1 of Exhibit B regarding the estate's claims and causes of action is an executory contract as initially alleged by CLI in its *Motion Requesting Reopening of Chapter 11 case under 11 U.S.C.A. §350(b)*[2] (Docket No. 2559, pg. 33).

### *Executory Contracts pursuant to 11 U.S.C. §365*

The area of executory contracts in Bankruptcy has been defined as a "thicket… where lurks a hopelessly convoluted and contradictory jurisprudence." Cohen v. Drexel Burnham Lambert Group, (In re Drexel Burnham) 138 B.R. 687, 690 (Bankr. S.D.N.Y. 1992) (quoting Andrew, Executory Contracts Revisited: A Reply to Professor Westbrook, 62 U. Colo. L. Rev. 1 (1991). "[i]n no area of bankruptcy has the law become more psychedelic than in the one titled 'executory contracts.'" In re Drexel Burnham, 138 B.R. at 690 (quoting Westbrook, A Functional Analysis of Executory Contracts, 74 Minn. L. Rev. 227, 228 (1989)).

Section 365(a) provides in pertinent part: "… the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). The ability to "assume or reject any executory contract," subject to court approval, is one of the most powerful tools in the bankruptcy tool kit. See Gray v. W. Envtl. Servs. & Testing, Inc. (In

---

[2] CLI stated the following in the above referenced motion: "[e]vidently, Redondo assumed the Liquidating Agreement, as an executory contract, and the Bankruptcy Court approved it since it made its ruling in the aforementioned adversary proceedings. Even though a precise definition of executory contracts cannot be suggested, under non-bankruptcy law a contract is executory if any obligation remains to be performed by either party. G.M. Treister, J.R. Trost, L.S. Forman, K.N. Klee, R.B. Levin, Fundamentals of Bankruptcy Law, 5th ed., United States, ALI-ABA, 2004, pages 241. Certainly, Redondo still has not performed its obligation of paying the interest owed to Lord. Under Bankruptcy law, executory contracts have been interpreted in the context of the definition suggested by Professor Vern Countryman, stating that a contract qualifies as executory if, at the time of bankruptcy, both parties had material obligations outstanding. G.M. Treiter, Id., at 241. Under this interpretation, Lord and Redondo had unperformed obligations mandated by the Liquidating Agreement at the time that Redondo filed for bankruptcy. Once Redondo assumed the Liquidating Agreement and it was approved within the Plan, Lord performed its duties in accordance with such Agreement by cooperating in the proceedings at the adversary case" (Docket No. 2559, pg. 33).

re Dehon, Inc.), 352 B.R. 546, 558 (Bankr. D. Mass. 2006) citing Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.), 360 F. 3d 291, 296 (1st Cir. 2004); Thinking Machs. Corp. v. Mellon Financial Services Corp. (In re Thinking Machs. Corp.), 67 F. 3d 1021, 1024 (1st Cir. 1995); Pub. Serv. Co. of NH. V. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.), 884 F. 2d 11, 15 (1st Cir. 1989); Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.), 208 F. 3d 498, 505 (5th Cir. 2000).

The term "executory contract" is devoid of statutory definition. Most courts have adopted Professor Countryman's definition of an executory contract which also embodies the material breach test. The definition is the following: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn. L. Rev. 439, 460 (1973). "Once contracts fully performed on one side or the other are eliminated, only contracts materially unperformed on both sides remain. These are the contracts that are generally considered to be executory contracts in bankruptcy." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 365.02[2][a] (16th ed. 2018); See also; Mission Product Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F. 3d. 389, 395-396 (1st Cir. 2018), *cert. granted in part[3]*, 139 S. Ct. 397, 202 L. Ed. 2d 309 (U.S. Oct. 26, 2018) (No. 17-1657)("Executory contracts, although not defined in the Bankruptcy Code, are generally considered to be contracts 'on which performance is due to some extent on both sides'"). Section 365(a) provides the mechanism for the debtor-in-possession to assume those contracts that are beneficial and reject

---

[3] The court notes that the petition for a writ of certiorari was granted part in In re Tempnology, LLC and is limited to Question 1 which is whether a debtor's-licensor's rejection of a license agreement under section 365 which constitutes a breach of said agreement, terminates the rights of the licensee that would survive the licensor's breach under applicable non-bankruptcy law.

those that may hinder its financial recovery, thus furthering "… Chapter 11's 'paramount objective' of rehabilitating debtors." Id. at 396 citing In re F.B.I. Distrib. Corp., 330 F. 3d. at 41.

"Professor Countryman observed that if the debtor fully performed before the commencement of the case, and only the other party's performance was left to be done, the contract should not be viewed as executory because the debtor's right to receive the other party's obligation would simply be an asset of the estate. If the contract were considered an executory contract, the trustee might inadvertently reject the contract and forfeit the asset. Moreover, the provision of the bankruptcy law that views rejection of an executory contract as a breach entitling the other party to a claim for damages would make no sense if the debtor already fully performed. Similarly, if the other party fully performed and only the debtor's performance remained to be done, the estate already has whatever benefit is to be gained from the contract. The other party has a claim against the estate for breach of contract if the debtor or the estate does not perform, but that party cannot deprive the estate of the performance that the estate has already received. However, if this were considered an executory contract, the trustee might assume the contract and convert the other party's claim to a first priority administrative claim. Since the estate could receive no benefit from such a conversion in the status of the claim, it seems appropriate to simply bar the trustee from ever assuming such a contract by treating the contract as nonexecutory." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 365.02[2][a](16th ed. 2018). Whether there are material unperformed obligations on both sides is determined at the time of the filing of the bankruptcy petition. See Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.), 744 F. 2d 686, 692 (9th Cir. 1984) (holding contracts executory at time of petition can be assumed); Carlson v. Farmers Home Admin. (In re Newcomb), 744 F. 2d 621, 624 (8th Cir. 1984) (stating critical time to be when the petition was filed).

Professor Andrew explains the key elements of assumption of an executory contract according to Professor Countryman and its consequences in the following manner:

"[t]he Countryman definition seems to have, in the assumption context, two elements of significance. First, it requires, with its specification that material performance be due from both parties, that there be an asset side and a liability side to the contract or lease. If it is an asset only (because the debtor has fully performed), then that asset will simply pass into the estate without special fanfare; the estate can sue to enforce the non-debtor party's obligations if necessary (or abandon the asset if it chooses). On the other hand if it is a liability only (because the non-debtor party has fully performed), then the non-debtor appropriately has just a non-priority claim against the estate.

Second, the definition apparently was intended to require, through the 'material breach' specification, that the non-debtor's remaining performance obligations be conditional on the debtor's. As Countryman put it, 'the concept of a nonexecutory contract should accommodate the contract so nearly performed by the bankrupt that his failure to complete performance would not constitute material breach which would excuse performance by the non-bankrupt party.' That seems to mean, appropriately, that if the debtor had the unconditional right to obtain the benefit of the other party's performance, so should the estate, and assumption should not be required." M. Andrew, Executory Contracts in Bankruptcy: Understanding Rejection, 59 U. Colo. L. Rev. 845, 891-892 (1988).

Some courts have moved away from Professor Countryman's approach and have adopted a "functional approach" which works "backward from an examination of the purposes to be accomplished by rejection, and if they have already been accomplished then the contract cannot be executory." See Rieser v. The Dayton Country Club Co. (In re Magness), 972 F.2d 689, 693 (6th Cir. 1992); In re Cardinal Indus., Inc., 146 B.R. 720 (Bankr. S.D. Ohio 1992); (discusses how 6th Circuit has adopted both Countryman definition and functional approach); In re General Dev. Corp., 177 B.R. 1000, 1013 (S.D. Fla. 1995); In re Drexel Burnham 138 B.R. at 708 n. 24. The "functional approach" application requires for the court to decide whether a contract is executory by analyzing whether rejection of the contract would benefit the debtor's estate and is thus aligned with the broader purposes of section 365. See Butler v. Resident Care Innovation Corp., 241 B.R. 37, 44 (D.R.I. 1999) (the "critical question… is whether rejection of the contract would benefit the debtor's estate") (citing In re Drexel Burnham, 138 B.R. 687) (discussing Cowell v. Hale, 289

-26-

B.R. 788 (B.A.P. 1st Cir. 2003). "Courts in this circuit apply both tests, often in tandem, and the 1st Circuit has endorsed this approach." Stevens v. CSA, Inc., 271 B.R. 410, 413 (Bankr. D. Mass. 2001) citing In re La Electronica, Inc., 995 F. 2d 320, 322 n. 3 (1st Cir. 1993); See also; Institut Pasteur v. Cambridge Biotech Corp., 104 F. 3d 489, 490 n. 2 (1st Cir. 1997); Summit Inv. & Dev. Corp. v. Leroux, 69 F. 3d 608, 610 n. 3 (1st Cir. 1995); In re Tempnology, LLC, 879 F.3d 389 (1st Cir. 2018). However, "…. no circuit has rejected the Countryman test outright in favor of the functional analysis, although the Court of Appeals for the Eleventh Circuit has approved the use of the functional test in several decisions." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 365.02[2][a](16th ed. 2018).

In a Chapter 11 case, the decision to assume or reject, except as to nonresidential property leases, must be made prior to or in conjunction with a confirmed plan. See 11 U.S.C. §§365(d)(2)[4] and 1123(b)(2)[5]; See In re Dehon, Inc., 352 B.R. at 559. In addition, parties to the executory contract must be given adequate notice of the intended assumption or rejection. Failure to provide adequate notice may result in a finding that the assumption or rejection was invalid. See In re Dehon, Inc., 352 B.R at 559 citing S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F. 3d 755, 763 (2d Cir. 1996).

***Is the Liquidating Agreement an Executory Contract?***

"Although the Countryman definition may be easy to state, the myriad differences in particular contracts have made it difficult to apply. Courts typically struggle with trying to find

---

[4] 11 U.S.C.§365(d)(2) provides: "[i]n a case under chapter 9,11, 1, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." 11 U.S.C. §365(d)(2).

[5] 11 U.S.C. §1123(b)(2) provides: "[s]ubject to subsection (a) of this section, a plan may—
    (b)(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section." 11 U.S.C. §1123(b)(2).

whether there are any unperformed obligations on either side and whether breach of those obligations would excuse the other party from performance." See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 365.02[2][b] (16th ed. 2018). Interpreted in a different manner, "[t]he focus of the 'executoriness' requirement is on some supposed special rule of bankruptcy law, thus taking the court's attention away from the core question: the parties' rights under state contract law. The hard questions in these cases are usually there, in contract law. Once the contract law questions are answered, the application of the bankruptcy payment rules is often simple." Jay Lawrence Westbrook, A Functional Analysis of Executory Contracts, 74 Minn. L. Rev. 227, 285 (1989).

The court needs to define and understand what the purpose(s) of a liquidating agreement is in the construction industry and the relation that pass-through claims have to the same in order to determine whether the Liquidating Agreement is an executory contract. It is important to note that there was a Subcontract Agreement entered into between Redondo and Lord on May 28, 1990, that is, prior to the Liquidating Agreement between Redondo and Debtor. The same engaged Lord to perform, as a subcontractor, electrical and other related work for the PR-2 Mayaguez Project as required by the contract entered into between Redondo and the PRHTA on March 15, 1990 (construction contract AC-200009) for the construction of improvements and additional lanes to a portion of Highway PR-2 between Mayaguez and Hormigueros. The court also notes that the Debtor in its Amended Schedule G (Executory Contracts and Unexpired Leases) does not list the Liquidating Agreement with Lord as an executory contract (Docket Nos. 134, 168).

The first step is to define what a "pass-through" claim is. In Interstate Contr. Corp. v. City of Dallas, 135 S.W. 3d 605, 610 (Tex. 2004), the Supreme Court of Texas defined "pass-through claim," in the following manner:

-28-

"… a claim (1) by a party who has suffered damages (in this case, a subcontractor); (2) against a responsible party with whom it has no contract (here, the City); and (3) presented through an intervening party (the contractor) who has a contractual relationship with both. Carl A. Calvert, Pass Through Claims and Liquidating Agreements, Construction Lawyer, Oct. 18, 1998, at 29; 3 Bruner and O'Connor on Construction Law §8:51 (2003). Instead of one lawsuit between a subcontractor and general contractor and another between the general contractor and the owner, pass-through claims permit a contractor to pursue its subcontractor's claims directly against the owner. 3 Bruner and O'Connor on Construction Law §8:51." See also; Daniel M. Drewry & Holly Streeter-Schaefer, Keep Your Friends Close, But Your Enemies Closer: Joint Defense and Liquidating Agreements in Construction Litigation /
www.americanbar.org/content/dam/aba/directories/construction_industry_knowledge_base/meetings/2015-annual/an 15 wc-paper.pdf.[6]

Therefore, for a pass-through claim to exist, there must be an agreement between the contractor and the subcontractor. Liquidating Agreements are used to avoid the limitation of the "Severin Doctrine"[7] and thus, the same provide that the contractor remains liable to the subcontractor or supplier to the extent of recoveries obtained by the contractor on their behalf from the owner. A liquidating agreement has been defined as a "type of settlement agreement wherein the contracting parties liquidate or settle the dispute between them and agree to pass

---

[6] In this article the term "pass- through claim is defined in the following manner:

"Generally, a 'pass-through' claim is a claim by (i) a party who has suffered damages; (ii) asserts a claim against a third party believed to be responsible (and with whom it has no contract); and (iii) presented or asserted through one or more intervening parties that has a contract with the alleged responsible party. The pass-through claim may consist of the general or prime contractor prosecuting the claim of its subcontractor upstream against the owner. Alternatively, the pass-through claim may really be the functional claim equivalent of an assignment of the prime contractor's claim rights to the subcontractor so as to allow the subcontractor to pursue its claim against the owner in the prime contractor's name."

[7] In Severin v. United States, 99 Ct. Cl. 435, 442-443 (1943), the United States Court of Claims held that a contractor suing on behalf of its subcontractor would not be allowed to recover for losses suffered by its subcontractor because the subcontract contained an express clause that exculpated the prime contractor from all liability to the subcontractor for any loss or damage caused by the owner. Therefore, the Severin Doctrine is applicable "… [w]hen a lower tier subcontractor releases the contractor from liability, thereby precluding recovery by the contractor from the owner of damages sustained by the releasing parties as a result of the owner's breach. The key to the validity of the pass-through is that contractor liability to its subcontractors and suppliers on their pass-through claims has not been released or otherwise barred. Ultimately, the contractor must be 'responsible' to the subcontractor for damages. The Severin Doctrine basically provides that the general contractor 'has no basis for permitting or sponsoring the subcontractor's suit unless the [general contractor] has paid the subcontractor or remains liable to reimburse it in the future.'" Daniel M. Drewry & Holly Streeter-Schaefer, Keep Your Friends Close, But Your Enemies Closer: Joint Defense and Liquidating Agreements in Construction Litigation; See also; Mitsui & Co. v. Puerto Rico Water Resources Authority, 528 F. Supp. 768 (D.P.R. 1981).

through some or all of the claims to a third party." <u>See</u> Daniel M. Drewry & Holly Streeter-Schaefer, <u>Keep Your Friends Close, But Your Enemies Closer: Joint Defense and Liquidating Agreements in Construction Litigation</u> referencing 3 <u>Bruner & O'Connor on Construction Law</u> §8:51 (2014).

Liquidating agreements in the construction industry are used as a mechanism to bridge the lack of privity between the owner and subcontractor, and thus, facilitate recovery. Liquidating Agreements generally contain the following elements: "(1) allow the subcontractor and supplier to present their claims in the name of the contractor but at no expense to the contractor; (2) require the claims to include an amount for the contractor's markup; and (3) limit the liability of the contractor to whatever sums are recovered by it from the owner on their claims." <u>Id</u>. referencing Bruner & O'Çonnor on Construction Law, §19:25; see also; <u>Roy A. Elam Masonry, Inc. v. Fru-Con. Const. Corp.</u>, 922 S. W. 2d 783 (Mo. Ct. App. E.D. 1996) (enforcing liquidating agreement to preclude a subcontractor from recovering anything from the contractor beyond whatever the contractor recovered from the owner on the subcontractor's behalf).

Liquidating Agreements have been described as "… a conditional payment arrangement" between the contractor and the subcontractor. "From the general contractor's perspective, the liquidating agreement limits its exposure to the downstream subcontractor in the event the pass-through claim fails. The subcontractor, meanwhile, acquires direct access to the owner. A typical liquidation agreement includes a contractor's admission of exposure to the downstream party (in order to avoid the "Severin Doctrine" by preserving liability to the subcontractor) paired with a subcontractor's agreement to limit its recovery to that which is achieved by the contractor. In addition, liquidation agreements frequently expressly address the amount to be paid from the recovery received, how it will be calculated (e.g., is the subcontractor entitled to first dollar

payment), and the scope of the release of claims (e.g., the subcontractor's sole relief is tied to the contractor's recovery)." Id.

This court concludes, after analyzing the nature of pass through claims and their relationship with liquidation agreements, that a liquidation agreement is not an executory contract pursuant to section 365(a). Lord's claim did not originate from the liquidation agreement, rather Lord's claim originated from the subcontract it executed with the Debtor by which Lord agreed to perform, as a subcontractor, the electrical and other related work for the PR-2 Mayaguez Project and all the (monetary) damages Lord sustained, which were attributed to PRHTA (A detailed description of the same were provided by Debtor/ Plaintiff in its post-trial brief in Adv. Proc. 03-00194, Docket No. 115, pgs. 10-24). At the time of the bankruptcy filing, Lord had already fully completed the work it was subcontracted to do by Redondo for the Mayaguez Project, meaning that the Debtor had already benefited from the subcontract. However, in order to complete the electrical work that was subcontracted, Lord (and also Remodelco) encountered numerous difficulties and delays caused by the PRHTA which materialized into the subcontractor claims. Lord's pass-through claim includes extended general home office overhead, extended job overhead, additional labor costs due to loss of productivity, extended overhead for miscellaneous tools and expenses, and a profit factor of 15%. Therefore, Lord's claim[8] was not created because Redondo rejected the liquidating agreement.

---

[8] The Plaintiff/Debtor in its post-trial brief stated the following:

"The original completion date for Lord's work was October 10, 1991, and due to the delays caused by PRHA, Lord had to remain at the project until May 15, 1994. (RCC's EX 68) (Tr. Of 2/26/07, pp. 1238-1239).

RCC's EX 68 contains the cost analysis of Lord's claim done by Eng. Mercado with the assistance of Lord's comptroller, showing a claim totaling $1,746,085.00. RCC's EX 68 includes extended general home office overhead, extended job overhead, additional labor costs due to loss of productivity, extended overhead for miscellaneous tools and expenses, and a profit factor of 15%. In computing the extended general and home office overhead, Eng. Mercado also used the Eichleay formula. (Tr. Of 2/26/07, pp. 1238-1242, 1266).

-31-

Viewed from a different perspective, if the Liquidating Agreement were an executory contract, there would be an asset and a liability side to the contract. In this particular type of arrangement, the idea is that the entity from which Lord and Remodelco's (the subcontractors') pass-through claims will get paid is from the PRHTA (which was the entity that was ultimately responsible for the extensive delays and project difficulties), which ultimately benefits the contractor's pocket (Redondo) because otherwise Lord and Remodelco would have filed a lawsuit for their claims based on their damages, namely: extended general home office overhead, extended job overhead, additional labor costs due to loss of productivity, extended overhead for miscellaneous tools and expenses, and a profit factor of 15%, directly against Redondo.

At the time of the Debtor's bankruptcy filing, Lord had already completed its obligations under the subcontract with Redondo. The interference, differing site conditions and extensive delays caused by the PRHTA, resulted in Lord's pass-through claim in the amount of $1,746,085[9], meaning that it already had a pre-petition pass-through claim at the time of Redondo's bankruptcy filing. However, since Lord lacked privity with PRHTA and could not file a lawsuit to claim its damages, it had to enter into the Liquidation Agreement with Redondo in August of 1994, and which was subsequently amended. Lord's other option could have been to file a lawsuit against Redondo for its claim. Lord's obligations under the liquidation agreement consisted in certain cooperation obligations as to the adversary proceeding the Debtor brought against PRHTA and

---

As stated by Eng. Mercado, Lord had never encountered, either before or after the Mayaguez project, the amount of delays and problems it had to face in the PR-2 Mayaguez Project (Tr. Of 2/26/07, p. 1243)." (Adv. Proc. 03-00194, Docket No. 115, pgs. 14-15).

[9] Lord's pass-through claim in the amount of $1,746,085 is comprised of the following components: Extended General Home Office Overhead: $597,840; Extended Jobsite Overhead: $567,760; Labor Productivity Loss: $291,212: Added Expenses for Miscellaneous Work: $48,747: Added Material Costs due to Inflation: $12,776. This adds up to a subtotal of $1,518,335 plus a profit in the amount of $227,750 for a total claim of $1,746,085 (Docket No. 2627, pg. 14)

in which Lord participated in conformity with the Liquidation Agreement (Adv. Proc. 03-00194, Docket. No. 75[10]).

For the reasons explained above, this court finds that the Liquidating Agreement is not an executory contract pursuant to section 365(a), it is a "conditional payment arrangement" regarding the subcontractor's already existing pass-through claim. This "conditional payment arrangement" was executed between the contractor and the subcontractor which was entered into primarily because of the subcontractor's lack of privity with the owner or in this case, the PRHTA. Lord's pass-through claim is a conditional claim, whose payment was conditioned on the outcome of the subsequent bankruptcy estate's cause of action regarding the PR-2 Mayaguez Project, which was litigated in adversary proceeding 03-00194. The monies from the pass-through claims (Lord and Remodelco), if the Plaintiff/Debtor was successful in the litigation of this particular adversary proceeding, would be collected eventually from PRHTA's funds, not from Redondo and what later became the Debtor's bankruptcy estate (the original liquidating agreement was first executed on August 15, 1994 and subsequently amended on March 2001).

The Debtor was aware of the nature of Lord's pass-through claim. The Debtor on February 17, 2005 (Docket No. 1017) filed its *Supplement to First Amended Plan of Reorganization* in which it specifically disclosed that one of the amendments was to Item No. 3 which is the Estate's Claims and Causes of Actions (Exhibit B) of the Schedule of Plan Documents annexed to the Plan. The amendment to Exhibit B consisted of 2 footnotes, footnote 1 being the subject of this convoluted controversy. This court finds that the supplement to the First Amended Plan of

---

[10] On December 28, 2006, a final pretrial hearing was held and the Minute Entry/ Order read as follows: "The Joint pretrial report shall be filed no later than January 20, 2007 signed by both parties. If the PRHA fails to file the joint pretrial report, sanctions will be imposed of $1,000.00 per day. The Puerto Rico Highway Authority is allowed to take the depositions of the personnel from Remodelco and Lord Electric no later than January 25, 2007. The marking of the exhibits is scheduled for February 7, 2007 at 2:00pm. The trial remains as scheduled [for] February 12, 2007 to February 16, 2007. If the need [be] the same will be continued for February 27 and 28, 2007 at 9:00am. Parties are allowed to file motions in limine five (5) days before trial" (Adv. Proc. 03-00194, Docket No. 75)

Reorganization which resulted in the inclusion of "footnote 1" to the Estate's Claims and Causes of Actions is a binding provision of a confirmed plan and the parties involved have for over a decade, since before the date the plan was confirmed on October 6, 2005, consistently treated this claim as a pass-through claim in conformity with the purpose of a Liquidation Agreement and the ensuing litigation, as explained above.

The next step of the analysis involves the doctrine of judicial estoppel and its applicability regarding the pass-through claims of Lord and Remodelco. The court is aware that in the instant case Remodelco did not file a proof of claim nor is referenced in a footnote (of the bankruptcy estate's claims and causes of action) as having executed a liquidating agreement for its pass-through claim.

### *Equitable Estoppel regarding the Pass-Through Claims*

At this juncture, the court clarifies that the doctrine of judicial estoppel and equitable estoppel are different doctrines and, thus, have different requirements. The parties in this case seem to treat these doctrines interchangeably.

The primary objective of the doctrine of equitable estoppel is to "… prevent injustice when an individual detrimentally and predictably relies on the misrepresentation of another." Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F. 3d 1 (1st Cir. 2009). In Mimiya Hosp., Inc. SNF v. United States HHS, 331 F. 3d 178, 182, the First Circuit explained the doctrine of equitable estoppel in the following manner: "… a party seeking to assert estoppel must demonstrate that (1) the party to be estopped made a 'definite representation of fact to another person having reason to believe that the other [would] rely upon it;' (2) the party seeking estoppel relied on the misrepresentations to its detriment; and (3) the 'reliance [was] reasonable in that the party claiming the estoppel did not know that its adversary's conduct was misleading.'" Id. citing Heckler v. Community Health Servs., 467 U.S. 51, 59, 81 L. Ed. 2d 42, 104 S. Ct. 2218 (1984);

-34-

see also; Benitez-Pons v. Commonwealth of Puerto Rico, 136 F. 3d 54, 63 (1st Cir. 1998); Clauson v. Smith, 823 F. 2d 660, 661-62 (1st Cir. 1987). Moreover, to assert equitable estoppel a party must prove that "it relied on its adversary's conduct in such a manner as to change [its] position for the worse." Id. at 182 citing Heckler v. Community Health Servs., 467 U.S. at 59. The doctrine of equitable estoppel is equivalent to the state law doctrine of "actos propios." See Int'l Ge. v. Concrete Builders of P.R., 104 D.P.R. 871(D.P.R. 1976). The Supreme Court of Puerto Rico in Int'l Ge. v. Concrete Builders of P.R., explained the doctrine of "actos propios" in the following manner:

> "[t]he contents of the rule that nobody is allowed to go against his own acts is grounded and rooted in the general principle of Law which orders that one should act in good faith in the juridical life. Contradictory behavior has no place in the field of Law, and should be prevented. This principle has as a parallel in English Law the doctrine of 'estoppel.' The minimum typical effect which should be acknowledged to unilateral acts is that they set up an 'estoppel.' The latter prevents that the subject upon whom the unilateral act may be charged may act in contradiction with his declared will.
>
> Since this 'going against one's own acts' is a general principle of Law, of universal validity, it spontaneously issues from the provision of art. 6 of the Civil Code instructing that when there is no statute applicable to the case, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration. Its efficacy, its entailing strength has life and effect of its own, which tend to protect the trust deposited in the appearances, which by extension is the protection of a social interest or the attainment of an ideal of justice. The necessary premises or constituting elements for the application of the juridical rule that no one can go against his own acts may be summarized as follows: (a) a certain behavior of a subject, (b) that he has given life to a situation contrary to reality, that is, apparent and, through such appearances, may influence the behavior of others, and (c) that it be the basis of the trust of another party which has acted in good faith and that, for that reason, has acted in a manner which would cause him prejudice if his trust was defrauded." Int'l Ge. v. Concrete Builders of P.R., 104 D.P.R. 871, 877-878 (1976); See also; Vivoni Farage v. Ortiz Carro, 179 D.P.R. 990 (2010); Comisionado de Seguros de Puerto Rico v. Universal Insurance Company, Inc., 187 D.P.R. 164 (2012).

Lord's position regarding the doctrine of equitable estoppel, which is similar to the state law doctrine of "actos propios), is premised on the following:

> "Debtor is estopped from changing the position it has maintained with its own acts doctrine ("actos propios"), since during more than 12 years Debtor has assumed a conduct that earned the trust of Lord and created a legal and binding situation on which Lord relied and acted. Having Debtor assumed a position for more than 12 years and Lord rested and acted on such position, Debtor cannot now change and assume in 2017 a groundless position that is contrary to the position it had before, which change in position will cause economic prejudice to Lord. The rule that it is not legal to act against your own acts ("a nadie le es lícito ir contra los propios actos") is a general principle of law of universal validity embodied in article 7 of the P.R. Civil Code. Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 877-878 (1976)." (Docket No. 2629, pg. 12).

Redondo argues that Lord is unable to claim the doctrine of "actos propios" due to its lack of good faith, mainly because it knew that it was being overpaid because of the 2005 amendment to the Liquidating Agreement. Redondo contends the following:

> "[i]n this particular case, the Litigation Trust Administrator overpaid Lord under the provisions of the 2001 amendment, when in fact if payment was to be made pursuant to the Exhibit to the Confirmed Plan as Supplemented included in the footnote the 2005 amendment mandated payment strictly of 15% of the Debtor's recovery related to Lord's claim, less proportionate expenses. As calculated by the Debtor payment according to the footnote's language is for a lesser amount. Lord knew that it was been paid under the 2001 amendment and not under the 2005 amendment. Lord reaffirmed in this Bankruptcy Court the 2001 amendment however it did not recognize the overpayment received considering the 2005 amendment. Under this set of undisputed facts, Lord lacks good faith and cannot claim the doctrine of 'actos propios.' In order to claim this doctrine, Lord must have acted in good faith and have clean hands" (Docket No. 2627, pg. 7).

The court finds that CLI failed to demonstrate that the traditional elements of equitable estoppel are present in this case; such as proving detrimental reliance as to Redondo's misrepresentations which made CLI change its position for the worse. Moreover, this court also finds that CLI and Redondo have also failed to apply the requisites of the state law doctrine of "actos propios" to the particular facts of this case. In particular, the parties have omitted discussing the specific acts that have "… given life to a situation contrary to reality, that is, apparent and, through such appearances, may influence the behavior of others." Thus, this court

does not need to discuss further the precise parameters and requirements of an estoppel claim against Redondo.

### *Judicial Estoppel Regarding the Pass-Through Claims*

This court in Hotel Airport, Inc. v. Best Western Int'l Inc. (In re Hotel Airport, Inc.), 2015 Bankr. Lexis 3990, *44-45 (Bankr. D.P.R. 2014) adopted the legal standard of the doctrine of judicial estoppel of the First Circuit and stated the following regarding the same:

"In Perry v. Blum, 629 F. 3d 1, 8-9 (1st Cir. 2010), the First Circuit summarized the doctrine of judicial estoppel as follows:

The doctrine of judicial estoppel is equitable in nature. It operates to prevent a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding. InterGen N.V. v. Grina, 344 F. 3d 134, 144 (1st Cir. 2003). The purpose of the doctrine is to protect the integrity of the judicial process. It is typically invoked when a litigant tries to play fast and loose with the courts. New Hampshire v. Maine, 532 U.S. 742, 749-750, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001); Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F. 3d 23, 33 (1st Cir. 2004); Patriot Cinemas Inc. v. Gen. Cinema Corp., 834 F. 2d 208, 212 (1st Cir. 1987).

The contours of judicial estoppel are hazy. But even though its elements cannot be reduced to a scientifically precise formula, New Hampshire, 532 U.S. at 750, courts generally require the presence of three things before introducing the doctrine into a particular case. First, a party's earlier and later positions must be clearly inconsistent. Id.; Alt. Sys. Concepts, 374 F. 3d at 33. Second, the party must have succeeded in persuading a court to accept the earlier position. New Hampshire, 532 U.S. at 750; Alt. Sys. Concepts, 374 F. 3d at 33. Third, the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court. New Hampshire, 532 U.S. at 751; Alt. Sys. Concepts, 374 F. 3d at 33.

Ordinarily, the party against whom judicial estoppel is invoked must be the same party who made the prior (inconsistent) representation. See InterGen, 344 F. 3d at 144 (explaining that judicial estoppel 'prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant' in the same or an earlier proceeding); Brewer v. Madigan, 945 F. 2d 449, 455 (1st Cir. 1991) (explaining that judicial estoppel prevents 'a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party in a prior proceeding'). Courts normally refuse to apply judicial estoppel to one party based on the representations of an unrelated party. See e.g., Parker v. Wendy's Int'l, Inc., 365 F. 3d 1268, 1272 (11th Cir. 2004); Bethesda Lutheran Homes & Servs., Inc. v. Born, 238 F. 3d 373, 381-382 (7th Cir. 2001); Tenn. Ex rel. Sizemore v. Surety Bank, 200 F. 3d 373, 381-82 (5th Cir. 2000); see also; 18B Charles

-37-

A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure §4477, at 618-619 (2nd. ed. 2002). Nevertheless, courts sometimes have allowed judicial estoppel when the estopped party was responsible in fact for the earlier representation, see e.g., Ladd v. ITT Corp., 148 F. 3d 753, 756 (7th Cir. 1998), or when the estopped party was the assignee of a litigation claim or assumed the original party's role, see 18B Wright et al., supra, §4477, at 618-619.  Perry v. Blum, 629 F. 3d at 8-9'" In re Hotel Airport, Inc., 2015 Bankr. Lexis 3990, *44-45.

CLI argues that the doctrine of judicial estoppel is applicable to Redondo due to its alleged contradictory and groundless new position. Lord alleges the following:

"Debtor's new argument is contrary to the position it has sustained before this Court during more than 14 years. During such period of time all [of] Debtor's actions were consistently complying with the provisions of the Liquidating Agreement with Lord. All of Debtor's actions during that period that began in December 2003 throughout the issuance of judgment on August 31, 2009, the July 12, 2012 payment by Debtor of Lord's principal amount of $1,746,085 and, thereafter until April 2016, when Debtor's attorney, Mr. Cuprill, executed and sent the Memorandum referred to in page 6 above, Debtor was actively complying with the Liquidating Agreement as amended in 2001. It is now, in 2017, that Debtor, with different attorneys, deliberately changes its position in an attempt to unjustly enrich its stockholders by not paying the money that rightfully belongs to Lord, because Debtor already disbursed all the amount of money to its stockholders, without any consideration to the ongoing litigation and the jurisdiction of this Court" (Docket No. 2636, pg. 16).

"[t]he allegations of Debtor in paragraph 18 attempt to convert Lord's claim as if it were a claim against Debtor. That is also a distortion of the facts since the Liquidating Agreement, as amended, the Trust Administrator's memorandum, Debtor's attorney memorandums and motions speak by themselves and demonstrate the true fact, i.e., that Lord's claim as to PR-2 Mayaguez project is not as a creditor of Debtor because its claim is against PRHTA and Debtor is a conduit of that claim. That is an undisputed fact and it is now, in 2017, that Debtor is creating for the first time an allegation that is contrary to everyone's acknowledgement that Lord is not a creditor.

Finally, on page 7 Debtor alleges that Lord 'failed to be candid to the Court as to why the footnote was included in a Supplement to the Plan.' It appears that Debtor forgot what is written in Lord's motion of September 29, 2016 (Doc. #2574) replying to Debtor's Objection to Lord's Motion. Pages 5 to 7 of said motion contain a detailed explanation of the true facts relating to the origin of the footnote. In said motion Lord included the same Exhibits 1 and 2 that Debtor now includes in its motion, in addition to a copy of the Proof of Claim, which Debtor failed to mention and include with its motion" (Docket No. 2629, pg. 17-18).

The Debtor contends that the doctrine of "actos propios" or judicial estoppel is applicable to Lord's actions or inactions based upon the following:

-38-

"Lord had many opportunities prior to confirmation to protect its interest in any proceeds to which it could have been entitled yet it failed to act. The record of the case proves these undisputed facts:

1. Lord failed to request that the Liquidating Agreement be assumed by the Debtor.

2. Lord failed to respond to the objection to claim #139 and alert the Court of the existence of the Liquidating Agreement and the rights therein conferred to Lord which sustained its claim.

3. Lord failed to object to the Disclosure Statement, which did not disclose the existence of the Liquidating Agreement and its impact in the recovery of any award under Adversary Proceeding No. 03-00194.

4. Lord failed to object to the confirmation of the Plan which included a provision which specifically states that all executory contracts not assumed by the Debtor were deemed rejected on the Effective Date.

5. Lord failed to formally request that its contingent pass through claim be classified separately, as it was advised in the memorandum of Mr. Arietta, which was addressed to Lord and which responded to the concerns raised in the letter of January 14, 2005 regarding the treatment given by the Plan to Lord's claim #139 (a document now cited and included in the record by Lord).

6. Lord failed to object to the language of the footnote which only preserved the right to receive 15% of the recovery, less proportionate expenses and failed to mention Lord's alleged right to receive in its entirety any amounts which were specifically granted under an award" (Docket No. 2636, pgs. 18-19).

After considering the parties' arguments, the court concludes that both Lord and Redondo have fallen short in the application of the three factors that are generally required for the applicability of the doctrine of judicial estoppel to the legal record of this case. Both parties refer to documentation such as the Liquidating Agreement, the Debtor's attorney memorandum, and the Trust Administrator's Memorandum, which were never presented to the court in order to persuade it to accept a particular position. Notwithstanding, the court finds that Redondo's position regarding the subcontractor claims pertaining to the record of the case in adversary proceeding 03-00194 are inconsistent with the arguments it brings forth in this contested matter.

The complaint in this adversary proceeding was filed on December 23, 2003. Redondo in paragraphs 20, 21 and 23 of the complaint alleges the following:

"(20) After the substantial completion of the Project, RCC[11] performed additional work until May 31, 1995. RCC requested from ACPR[12] extended overhead for the 1,338 additional days. ACPR granted extra days up to November 1, 1994, but notwithstanding did not grant any extended overhead.

(21) ACPR doesn't have any claim against RCC as to the Project.

(23) ACPR owes RCC the following amounts:

Inefficiency…………………………………… $1,336,180.16
Equitable adjustment for extra work orders….. $394,042.77
Additional work ……………………………… $360,544.79
Extended overhead …………………………. $1,304,550.00
Claims of Sub-contractors…………………... $1,831,085.00
Sub-Total…………………………………….$5,226,402.72

Interest from November 1999 to November 30, 2003
9 yr @ 6.5% ………………………………….. $3,985,499.51[13]
Total ………………………………………….. $9,211,902.67." (Adv. Proc. 03-00194, Docket No.1, pg.7)

Moreover, Redondo in the prayer to the complaint requested the following:

"Wherefore, RCC respectfully prays for judgment: (1) [a]s to the first cause of action, directing ACPR to pay forthwith to RCC, the amount of $9,211,902.67, plus interest thereon December 1, 1994, until payment at 6.5% per annum, costs and attorneys' fees. (2) As to the second cause of action, finding ACPR in contempt for having withheld the $9,211,902.67 owed thereby to RCC and in so doing adversely affecting RCC's reorganization process, imposing sanctions, punitive damages, costs and attorney's fees on ACPR pursuant to 11 U.S.C. §§362(h) and 105(a). (3) As to the third cause of action, directing ACPR to turn over to RCC the $9,211,902.67, plus interest thereon at 6.5% per annum on December 1, 2004, until payment, plus costs and attorneys' fees" (Adv. Proceeding 03-00194, Docket No. 1, pg. 9).

On November 9, 2007, the Debtor filed its post-trial memorandum. In this memorandum, Redondo explains in detail all of the delays, interferences, and differing site conditions that it

---

[11] In the complaint, Redondo Construction Corporation is referred to as "RCC."

[12] In the complaint, Autoridad de Carreteras de Puerto Rico is referred to as "ACPR."

[13] Footnote 1 in the complaint states that, "[s]ince federal funds were used in the Project, the Federal Regulations require that RCC be paid within 30 days and that interest at 6.5% per annum be paid as to ay delay."

encountered when working in the PR-2 Mayaguez Project. Redondo also explains in detail the

delays, problem, interferences, and differing site conditions that Lord and Remodelco

encountered when working on this particular project (Adv. Proc. 03-00194, Docket No. 115, pgs.

10-24). Redondo in its post trial memorandum explained the following:

> "[t]he original completion date for Lord's work was October 10, 1991, and due to the delays caused by PRHA, Lord had to remain at the project until May 15, 1994. (RCC's EX 68)(Tr. Of 2/26/07, pp. 1238-1239).
>
> RCC's EX 68 contains the cost analysis of Lord's claim done by Eng. Mercado with the assistance of Lord's comptroller, showing a claim totaling $1,746,085.00. RCC's EX 68 includes extended general home office overhead, extended job overhead, additional labor costs due to loss of productivity, extended overhead for miscellaneous tools and expenses for inflation of miscellaneous materials, other expenses, and a profit factor of 15%. In computing the extended general and home office overhead, Eng. Mercado also used the Eichleay formula (Tr. Of 2/26/07, pp. 1238-1242, 1266).
>
> As stated by Eng. Mercado, Lord had never encountered, either before or after the Mayaguez project, the amount of delays and problems it had to face in the PR-2 Mayaguez project. (Tr. of 2/26/07, p. 1243).
>
> Eng. Díaz, Remodelco, Inc.'s ("Remodelco") president, RCC's subcontractor for special type concrete sidewalks and special purposes recreational areas called 'amenities,' work that was to be accomplished as RCC was doing the construction of the road, submitted Remodelco's $85,000 claim for extended overhead to RCC, resulting from the delays, design errors, and delays in decision making attributable to PRHA, and the ensuing additional work that Remodelco had to do. (Tr. of 7/2/07, pp. 12-15, 17-20)" (Adv. Proc. 03-00194, Docket No. 115, pgs. 14-15).

Moreover, Redondo, in its itemization of the amounts owed by PRHA regarding the PR-

2 Mayaguez Project, includes a line item titled, "Claims of Subcontractors" and below it discloses

Lord's claim in the amount of $1,746,085.00 and Remodelco's claim in the amount of $85,000.00

and it discloses the summation of these amounts as "Total Claimed Equitable Adjustment" in the

amount of $1,831,085.00. (Adv. Proc. 03-00194, Docket No. 115, pgs. 20-21). The Defendant

disclosed its position regarding the subcontractor claims in its post-trial brief. The Defendant or

the PRHTA stated the following:

-41-

"[a]dditionally, Debtor claimed $1,831,085.00 on account of sub-contractor claims. However, it could not present one piece of evidence of any contractual relationship between the Authority and the sub-contractor. Debtor could not present either any evidence that could demonstrate that the claim that was presented to the Authority on time pursuant to the contract. Mr. Angel Mercado of Lord Electric, the sub-contractor, actually testified that they presented the claim sometime in January 1996 (two years after the completion of the work). See Transcript of Trial p. 1249, ln. 7-11.

Lastly, RCC did not offer into evidence any pro[of] of the subcontractor's entitlement to any damages for delay or to any overhead claim. In the same way that the contractor failed to meet the burden of proof, the sub-contractor did not succeed in advancing its claims, based on the same arguments discussed before because the sub-contractor had the same obligations towards debtor that RCC had towards the Authority under contract and the same standard of proof applied.

For the reasons argued in the previous paragraphs, the sub-contractor claims should also be dismissed" (Adv. Proc. 03-00194, Docket No. 114, pgs. 66-67).

On August 31, 2009, the court, (Carlo, B.J.), entered a *Decision and Order* in which it discussed the PR-2 Mayaguez Project (Adv. Proc. 03-00194, Docket #129, pgs. 21-42), and concluded as follows regarding Lord and Remodelco's claims:

"Lord's and Remodelco's claims against RCC are included in Joint EX 41, in accordance with Section 109.04 of the Blue Book. They are the only two subcontractors with claims. (EX 68) (Tr. of 2/14/07, pp. 658-659, 668-691; Tr. of 07/02/07, pp. 1242-1243). And while PRHA argues that it had no contractual relationship with Lord and Remodelco, these claims were direct costs of completing the project." (adv. Proc. 03-00194, Docket No. 129, pg. 32).

The court also concluded:

"Notwithstanding RCC's demands for the amounts owed to it and its two subcontractors under the contract, PRHA to date, more than fifteen years after the substantial completion of the project, has not proceeded with its liquidation and as a consequence, has failed to pay RCC the items claimed to be due under the contract" (Adv. Proc. 03-00194, Docket No. 129, pg. 40).

The bankruptcy court also found that amongst the amounts owed by PRHA to RCC for the Mayaguez project, was the amount of $1,831,085.00 for the claims of subcontractors of which, $1,746,085.00 was allocated to Lord and $85,000.00 was allocated to Remodelco. The court also

-42-

allocated a profit component of 10% to the total equitable adjustment line item which included Lord and Remodelco's claim amounts ($1,831,085.00 x 1.10 = $2,014,193.05), plus the prejudgment interest at 6.5% from June 30, 1996 (Adv. Proc. 03-00194, Docket No. 129, pgs. 41-42, 55; Docket No. 130).

Subsequently, on February 11, 2010, this court entered a *Decision and Order* in adversary proceeding 03-00194 to dispose of the motions filed by the Debtor to amend the Court's *Decision and Order* of August 31, 2009 and motions by PRHA to amend or alter judgments of the Court entered on August 31, 2009, or for a new trial. In its *Decision and Order*, the court concluded as follows:

> "[w]ith respect to Mayaguez, RCC made claims for inefficiency, equitable adjustment for extra work orders due to inefficiency, extra work, extended overhead, subcontractor's claims, profit, interest and telephone. PRHA alleges that there were no findings regarding the adequacy of RCC's assertion of the claims on behalf of subcontractors and that 940 days must be eliminated from the award. PRHA also argues that there is no privity of contract between subcontractors and owner and thus, the prime contractor (RCC) must pass through the subcontractors claims to the owner (PRHA), which is exactly what RCC did. But, PRHA also argues that the[re] was no liquidation agreement with the subcontractors presented into evidence, nor evidence of RCC's liability.
>
> Judge Carlo concluded that RCC adequately documented the claims of subcontractors and that there was no question as to RCC's liability to Lord and Remodelco. The record shows that Lord participated in weekly meetings and that PRHA was well aware of the subcontractors upon the conclusion of Lord's electrical work."
>
> The motions to alter or amend by the PRHA were denied. (Adv. Proc. 03-00194, Docket No. 143, pg. 12).

On March 18, 2010, the PRHTA filed its *Statement of Issues on Appeal* regarding the Court's August 31, 2009 Judgment at Docket No. 130. One of the issues that the PRHTA presented was that the court erred in granting Redondo a monetary remedy for its subcontractors'/ pass-through claims because it failed to establish, either with sufficient evidence or simply lack of it, that it was entitled to such compensation in accordance with the standards and or requirements of the applicable law (Adv. Proc. 03-00194, Docket No. 154, pgs. 2-3). The

Bankruptcy Court's Decision and Order was affirmed by the district court on April 15, 2011 in civil case no. 10-1371, 10-1372 and 10-1373, which were consolidated. The court, regarding the subcontractor claims held that PRHTA waived any defense it had as to RCC's ability to bring the subcontractor claims in the proceedings below, and thus has not properly preserved this issue for appeal (Adv. Proc. 03-00194, Docket No. 238, pgs. 6-7).

The issue of whether Redondo lacked standing to assert subcontractor claims was appealed to the First Circuit by the PRHTA along with other three legal issues or claims of error which are not pertinent to this particular controversy (Adv. Proc. 03-00194, Docket No. 240, pgs. 7-8). The First Circuit regarding this particular issue affirmed the district court, because the PRHTA forfeited its Severin – based argument because it failed to raise the same as an affirmative defense. The First Circuit Court concluded as follows:

"[i]n an attempt to confess and avoid, the Authority suggests that it has not forfeited its challenge to the subcontractor-based damages because the challenge is purely legal in nature (see Appellant's Br. At 3). We reject this suggestion out of hand. Law-based arguments, like fact-based arguments, normally must be raised in the trial court, and (with possible exceptions not relevant here) failure to do so results in forfeiture. See, e.g., Martinez v. Colon, 54 F. 3d 980, 987 (1st Cir. 1995) (stating that legal theories not raised before trial court are subject to forfeiture).

To the extent that the Authority invites us to overlook the forfeiture of its Severin argument to avoid "a miscarriage of justice," Appellant's Br. at 4, we decline its invitation. '[T]he Severin doctrine is an affirmative defense that must be raised by [the] defendant.' Northrop Grumman Computing Sys., Inc, v. United States, 99 Fed. Cl. 651, 659 (Fed. Cl. 2011). Our precedent is clear that a trial court normally commits no error- let alone plain error -when it fails to consider *sua sponte* an affirmative defense not seasonably raised at trial. See, e.g., Dimarco-Zappa v. Cabanillas, 238 F. 3d 25, 35 (1st Cir. 2001); Amcel Corp. v. Int'l Exec. Sales Inc., 170 F. 3d 32, 35 (1st Cir. 1999)" (Adv. Proc. 03-00194, Docket No. 240, pgs. 7-8); See also; Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 678 F. 3d 115, 121 (1st Cir. 2012).

After the First Circuit rendered its *Opinion and Order*, Redondo filed on June 12, 2012 a *Motion for an Order Directing Withdrawal of Funds* requesting the United States District Court for the District of Puerto Rico the withdrawal of $10,605,379.82 from the $21,791,245.00 which

-44-

were originally deposited with the district court as a supersedeas bond to stay the execution of the judgments pending appeal. The amount of $10,605,379.82 is allocated in the following three (3) projects: (1) 03-00194 PR-2 Mayaguez for the amount of $9,327,326.18[14]; (2) 03-00192 Desvío Sur Patillas in the amount of $388,993.41; and (3) 03-00195 Dorado-Toa Alta in the amount of $889,060.23 (Civil No. 10-01371, Docket No. 66). The court notes that Redondo originally requested the amount of $10,402,099.66 for the PR-2 Mayaguez project. However, the "Home Office Overhead" line item in the amount of $1,074,373.48 was a contested issue at the time as were the prejudgment interest. Thus, Redondo requested the amount of $9,327,326.18 for the PR-2 Mayaguez Project which excludes the line item of "Home Office Overhead" in the amount of $1,074,373.48. The amount of $9,327,326.18 includes the claims of both Lord and Remodelco in the amount of $1,831,085.00 (Civil No. 10-01371, Docket No. 66, pgs. 2-3); (Adv. Proc. 03-00194, Docket No. 342, pg. 7-9; Docket No. 129, pg. 41-42).

The PRHTA and Redondo jointly requested that the Clerk of the Court issue a check to the order of Redondo for the principal amount of $10,469,315.21, plus forty-eight point zero percent (48.04%) of the interest earned on the $21,791,245.00 that was deposited by the PRHTA on June 14, 2011 (Civil No. 10-01371, Docket No. 71); (Adv. Proc. 03-00194, Docket No. 342, pg. 9, Exhibit I). The interest of forty-eight point zero percent (48.04%) of the interest earned on the $21,791,245.00 that was deposited by the PRHTA resulted in $57,677.55 (Adv. Proc. 03-00194, Docket No. 342, Exhibit IV). The principal amount to be disbursed decreased from $10,605,379.82 to $10,469,315.21 because it excluded the profit factor corresponding to the disputed extended home-office overhead. In the same manner, the amount that was allocated to

---

[14] The court notes that there is an immaterial mathematical error of $400, when it subtracted the $1,074,373.48 ("Home Office Overhead") from the total amount requested of $10,402,099.66. The remaining balance should have been $9,327,726.18 not $9,327,326.18.

the PR-2 Mayaguez Project decreased from $9,327,326.18 to $9,220,288.88 because of the 10% profit factor of the "Home Office Overhead" ($1,074,373.48 x .10 = $107,437.34).

It is important to note, that the exclusion of the "Home Office Overhead" and its corresponding 10% profit factor, reduced Redondo's claim for the PR-2 Mayaguez Project in the amount of $1,181,810.83 ($1,074,373.48 x 1.10 = $1,181,810.83) which is approximately a decrease of 11.36% of its original claim amount of $10,402,099.66. The issue of the calculation of extended overhead damages and the issue of prejudgment interest were vacated and remanded for further proceedings consistent with the Opinion from the First Circuit (Adv. Proc. 03-00194, Docket No. 240).

The record shows that the total equitable adjustment for the PR-2 Mayaguez claim was in the amount of $7,858,582.31. Lord and Remodelco's subcontractor claims formed part of the equitable adjustment amount and the 10% profit factor was calculated using this figure as a base ($7,858,582.31 x .10 = $785,858.22 = profit 10%) (Adv. Proc. 03-00194, Docket No. 342, pg. 7).

On June 20, 2012, the district court ordered the Clerk to disburse the amount of $10,469,315.21 plus 48.04% of the interest accrued on the amount deposited by the PRHTA and copy of the checks for the principal and the accrued interest are included in Adv. Proc. 03-00194, Docket No. 342, Exhibits IV and IV (Civil No. 10-01371, Docket No. 72); (Adv. Proc. 03-00194, Docket No. 342, pg. 9, Exhibit II & Exhibits IV & V).

The Litigation Trust Administrator's e-mail dated July 11, 2012 (Docket No. 2627, pg. 102) attached the following documents for the Litigation Board to review and to decide whether to approve distribution #3 which included the principal amounts of Lord and Remodelco's claims. The email reads in the following manner:

"Gentlemen:
I am including herewith a memorandum explaining the proposed use and distribution of funds received from USDC Case #3:10cv 1371. We request review and approval via e-

mail in order to proceed with the distribution. We are planning to start the distribution on Monday, July 16, 2012. Included in the attachments you will find the following documents:

1- Memorandum to Board dated July 11, 2012.
2- Spread sheet estimated operating expenses June 2012 thru December 2013.
3- Spread sheet Detail Lawyer Expenses June 2012 > December 2013.
4- Fee Agreement Attorney Cuprill.
5- Pass Thru Claim Analysis Lord and Remodelco PR-2 Mayaguez Claim.
6- References to Pass Thru Claim Analysis.
7- Spread sheet with distribution to unsecured creditors.

If you have any questions, please let us know." (Docket No. 2627, pg. 102).

Thereafter, the Litigation Trust Administrator sent another e-mail to the Litigation Trust Board on July 12, 2012 explaining that he was attaching a document titled, "Final Distribution 3" which is the correct document to be used and matches (corresponds) with the Memorandum. (Docket No. 2627, pg. 112).

The Litigation Trust Administrator provided a memorandum to the Litigation Trust Board that is dated July 11, 2012. This memorandum includes the allocation of the total monies received in Civ. Case No. 10-01371 for all three (3) projects. The total awarded amount was $10,469,315.00 and the interest amount was $57,678.00. From the total amount awarded ($10,469,315.00 + $57,678.00) the following expenses were deducted: (i) legal fees in the amount of $1,052,699.00; (ii) administrative expenses in the amount of $625,186.00; and (iii) estimated income tax in the amount of $150,000.00, resulting in a net distribution to creditors of $8,699,108.00 which was allocated in the following manner: (i) $1,395,381.00 for Continental Lord's claim; (ii) $68,352.00 for Remodelco's claim; and (iii) the remaining $7,235,375.00 for unsecured creditors (Docket No. 2627, Exhibit G).

According to Redondo's Litigation Trust Administrator's calculations, Lord was awarded a claim in the amount of $1,755,650.00 which is comprised of Lord's base claim in the amount of $1,746,085.00 and $9,565.00 of interest. Lord was paid a net amount of $1,395,381.00 after

deducting 10% for legal fees ($175,565.00); 18.94% for costs ($156,294.00) and less 18.83% estimated pre-chapter 11 cost ($28,410.00) (Docket No. 2627, Exhibit G). The line item of costs has an asterisk on the spreadsheet which explains that the 18.94% cost percentage was obtained by dividing the amount of Lord's claim by the undisputed amount of the total claim ($1,755,650.00 / $9,270,688.00) and 18.94% was multiplied by the amount of $825,204.00[15] (Docket No. 2627, Exhibit G). The court notes that the 18.94% deducted for the administrative costs and the 18.83% deducted for the estimated pre chapter 11 cost exceeded the alleged 15% expense allocation.

Also according to Redondo's Litigation Trust Administrator's calculations, Remodelco was awarded a claim in the amount of $85,998.00 which is comprised of Remodelco's base claim in the amount of $85,000.00 and $469.00[16] of interest. Remodelco was paid a net amount of $68,352.00 after deducting 10% for legal fees ($8,600.00); .928% for costs ($7,655.00) and less $1,391.00 in estimated pre-chapter 11 cost (Docket No. 2627, Exhibit G). For the line item of costs has an asterisk on the spreadsheet which explains that the .928% cost percentage was obtained by dividing the amount of Remodelco's claim by the undisputed amount of the total claim ($85,000.00 / $9,270,688.00) and .928% was multiplied by $825,204.00 (Docket No. 2627, Exhibit G).

The expenses that were deducted from the total amount awarded were those incurred for all three (3) adversary proceedings; namely, 03-00192; 03-00194 and 03-00195, meaning that Lord and Remodelco were sharing these legal fees and administrative costs (decreasing the

---

[15] The amount of $825,204.00 is approximately 22.05% of the amount of cost applicable to the entire PR-2 Mayaguez Claim (the base is in the total amount of $3,743,203.00). A percentage of 18.94 of the administrative cost attributed to Lord of the amount of $825,204 is 18.94% which results in the amount of $156,294.00 (Docket No. 2627, pg. 96). It is unbeknownst to the court how it was determined that 22.05% is the amount of cost applicable to PR-2 Mayaguez claim.

[16] The court notes that the line item states the amount of $469.00. However, there is an error in the summation of $85,000.00 + $469.00 given that it states that such amount is $85,998.00 (Docket No. 2627, Exhibit G).

amount of their claim and affecting their percentage of the total amount of the claim that was awarded). The total awarded amount was $10,469,315.00 and the interest amount was $57,678.00. From the total amount awarded ($10,469,315.00 + $57,678.00) the following expenses were deducted: (i) legal fees in the amount of $1,052,699.00; (ii) administrative expenses in the amount of $625,186.00; and (iii) estimated income tax in the amount of $150,000.00, resulting in a net distribution to creditors of $8,699,108.00 which was allocated in the following manner: (i) $1,395,381.00 for Continental Lord's claim; (ii) $68,352.00 for Remodelco's claim; and (iii) the remaining $7,235,375.00 for unsecured creditors (Docket No. 2627, Exhibit G). Therefore, Lord's net distribution after deducting all pertinent expenses for the three adversary proceedings and dividing this amount by the total net distribution to creditors resulted in 16.04% ($1,395,381.00/ $8,699,108.00); Remodelco's net distribution after deduction all pertinent expenses for the three (3) adversary proceedings resulted in .786% ($68,352.00/ $8,699,108.00) and Redondo's net distribution resulted in 83.174% ($7,235,375.00/ $8,699,108.00).

All four members of the RCC Litigation Trust Board unanimously approved Distribution #3 regarding civil case No. 10-01371 by July 13, 2012 (Docket Nos. 2559, 2627, pgs. 97-114) as required by Article VII, section 7.9B[17] of the first amended disclosure statement and Article V,

---

[17] Section 7.9B, "Litigation Trust Distributions" of the amended disclosure statement states in pertinent part: "[d]istributions from the Litigation Trust shall be made by the Administrator with the concurrence of a majority of the Litigation Trust Board of Supervisors from any available funds and from funds originating from the Estate's Claims and Causes of Actions first to any pending Administrative, Priority, except priority Tax Claims and Convenience Claims, then Pro-Rata to holders against Debtor of Allowed Priority Tax Claims, until full payment thereof, and thereafter Pro Rata to the holders of Allowed General Unsecured Claims against Debtor, provided, however, that no such holder shall receive more than 100% of its Allowed Claim. The Administrator will also make payments from the Litigation Trust with the concurrence of a majority of the Litigation Trust Board of Supervisors from any available funds for fees and expenses of administering the Litigation Trust. Any excess amount shall revest in the Reorganized Debtor" (Docket No. 879, pg. 25).

section 5.5[18] of the amended plan of reorganization. See also; Litigation Trust Agreement (Docket No. 1443).

On July 16, 2012, Redondo issued a check to Continental Lord in the amount of $1,395,381.00 and the memo line of the check reads, "Pass Thru Claim PR#2 Mayaguez Job" (Docket No. 2559-3).

Subsequently, on March 5, 2013, a hearing was held regarding adversary proceeding 03-00194 and the Order stated the following:

"(A) [p]arties inform and agree that the issues pending are: (1) calculation of post judgment interest and pre judgment interest in accordance with In re Redondo Construction Corp., 700 F. 3d 39 (1st Cir. 2012); and (2) the amounts owed, if any, for extended overhead in the Mayaguez Project pursuant to the court of appeals decision in In re Redondo Construction Corp., 678 F. 2d 115 (1st Cir. 2012). Both parties agree that the Eichleay formula is the basis for warranting extended overhead damages.

(B) Parties shall file joint stipulation of uncontested facts on or before May 10, 2013 and legal memoranda on or before May 30, 2013" (Adv. Proc. 03-00194, Docket No. 260).

After conducting a thorough analysis of Redondo's position regarding the subcontractor pass- through claims of Lord and Remodelco, which it initially brought forth in its complaint and then further explained in its post-trial memorandum and resulted in one of the legal issues which was discussed in three (3) Opinions and Orders, this court finds that the doctrine of judicial estoppel applies to the Debtor in the instant case regarding the validity and the amounts distributed for the subcontractor pass-through claims. See also (Adv. Proc. 03-00194, Docket No. 268, pg. 20). Redondo's position as to the subcontractor pass-through claims had been consistently

---

[18] Section 5.5, titled, "Litigation Trust Distributions," of the first amended Plan of Reorganization provides in pertinent part: "[d]istributions from the Litigation Trust shall be made by the Administrator with the concurrence of a majority of the Litigation Trust Board of Supervisors from any available funds and from funds originating from the Estate's Claims and Causes of Actions, first to any pending Administrative, Priority, except priority Tax Claims and Convenience Claims, then Pro Rata to holders against Debtor of Allowed Priority Tax Claims, until full payment, thereof, and thereafter Pro Rata to holders of Allowed General Unsecured Claims against Debtor, provided, however, that no such holder shall receive more than 100% of its Allowed Claim. The Administrator will also make payments from the Litigation Trust, with the concurrence of a majority of the Litigation Trust Board of Supervisors, from any available funds for fees and expenses of administering the Litigation Trust. Any excess amount shall revest in the Reorganized Debtor" (Docket No. 879, pg. 54-55).

evident from the onset of the complaint in the adversary proceeding until the First Circuit's determination that Redondo had standing to assert the subcontractor claims because the PRHTA failed to timely present its Severin-based affirmative defense, therefore waiving the same. It is evident that Redondo's standing to assert the subcontractor claims was a contested legal issue, meaning that Redondo presented its position regarding these subcontractor claims and had to persuade several courts to accept the same.

The judicial estoppel doctrine applies to Redondo because its new position regarding the subcontractor claims is inconsistent with its prior position as evinced in the extensive and convoluted travel of this adversary proceeding. Moreover, Redondo would derive an unfair monetary advantage if this new position is accepted by the court, thirteen (13) years after filing the complaint in the adversary proceeding and four (4) years after the disbursement of the principal payment of the subcontractor claims from the date of the motion to reopen on June 28, 2016 (Docket No. 2559).

Redondo collected monies from the complaint against PRHTA for the PR-2 Mayaguez project, which included the principal of the subcontractor claims (Lord and Remodelco). The Debtor represented to the courts that the claims of Lord and Remodelco were pass-through claims and that Redondo had legal standing to assert the same against the PRHTA. The Debtor all throughout this proceeding has failed to clarify to the courts and to the PRHTA, which was the entity that eventually ended up paying these monetary damages, that Lord and Remodelco would receive 15% of the total recovery of the project claim in conformity with a Liquidating Agreement (notwithstanding its claim), which simply meant that the Debtor would profit from the subcontractor claims since the filing of the complaint,[19] meaning that the pass-through claims,

---

[19] The complaint disclosed that the subcontractor claims were in the amount of $1,831,085.00 and the total amount requested was $9,211,902.67.00. The subcontractor claims constituted 19.88% of the total claim; 18.95% allocated

probably factored in the contractor's mark-up. Notwithstanding, the expense side which has been deducted from Lord's claim exceeds the 15% recovery allocation. According to the Litigation Trust Administrator's Memorandum, the legal percentage deducted was 10%; and the administrative expense of 18.94% (in addition to the $625,186 deducted from the total recovery amount of $10,469,315.00 + $57,678.00) and the 18.83% estimated in pre chapter 11 cost (Docket No. 2627, pgs. 94-96). The 18.94% is the percentage of Lord's claim compared to the total amount of the claim received for the PR-2 Mayaguez Project (($1,746,085.00 +$9,565.00) /$9,270,688.00)). The court finds that it is of utmost importance to consider not only the percentage of the monetary claim allocation but also the corresponding expense percentage allocation.

The Litigation Trust Administrator proceeded to make the pass-through claims distributions with the approval of all four (4) members of the Litigation Trust Board. The members of the Litigation Trust Board, which included 2 of the shareholders of the Debtor (Jorge Redondo and Miguel Redondo), and the Debtor's attorney who filed the supplement to the amended plan of reorganization that included the schedule of the estate's claims with the footnote as to Lord's pass through claim did not bring forth any issue or discrepancy with the footnote and/or the Liquidating Agreement, as amended, or to this Court's *Decision and Order* that itemized in the PR-2 Mayaguez project the subcontractors' total claim amounts that were due to Lord and Remodelco. In fact, copy of the Liquidating Agreement was first included as an Exhibit as part of the contested matters in the motion to reopen on June 28, 2016. (Docket No. 2559, Exhibits 1 & 2).

---

to Lord and .92% allocated to Remodelco. After the exclusion of the home overhead line item, Lord's claim percentage was 18.94% ($1,746,085.00/ $9,220,288.00).

Subsequently, all members of the Litigation Trust Board approved the distribution which was based on the amount of each of the subcontractor claims, not a 15% recovery from the total monetary amount of the claim for the PR-2 Mayaguez Project. The Litigation Trust Administrator's legal memorandum and the spreadsheet disclosed the different components of the distribution which disclosed that the principal of the subcontractor claims was being paid in full (exclusive of the 10% profit factor), not as a 15% percentage of the total principal amount recovered for the PR-2 Mayaguez Project. The principal awarded to Lord and Remodelco consisted in the entirety of their claims which was itemized by this court (and had also been itemized by Redondo as the Plaintiff in its post-trial memorandum at Adv. Proc. 03-00194, Docket No. 115, pgs. 20-21) in its August 31, 2009 *Decision and Order.* Lord and Remodelco's claims were not calculated as a 15% of the entire amount of Redondo's total claim for the PR-2 Mayaguez Project. There was no disclosure in the adversary proceeding that the claim of Lord would be paid pursuant to a Liquidating Agreement not the actual amount claimed to the PRHTA.

The Debtor paid Lord the amount of $1,395,381.00 with a check dated 07/16/2012 and in which the memo line read, "Pass Thru Claim PR#2 Mayaguez Job" (Docket No. 2559, Exhibit 3). On March 5, 2013, almost eight (8) months after Redondo disbursed the monies to Lord and Remodelco, there was a hearing in adversary proceeding 03-00194 wherein the parties informed and represented to the court that there were only two (2) pending matters; namely, the calculation of post judgment interest and pre judgment interest and the amounts owed, if any, for extended overhead in the Mayaguez Project. The issue of the calculation of post judgment interest and pre judgment interest and the amounts owed was finally concluded on April 21, 2016.

On April 21, 2016, the court rendered its *Opinion and Order* in all three (3) adversary proceedings (03-00192; 03-00194 and 03-00195) regarding the issue of pre judgment and post judgment interest in all three adversary proceedings which resulted in the pre-judgment interest

amount of $9,923,567.43, plus the interests accrued over said amount, less any applicable fees, in favor of Redondo (Adv. Proc. 03-00194, Docket No. 365). On April 4, 2016, the Debtor filed an *Urgent Motion for Calculation of Interest due Redondo Construction Corporation and for Setting Aside Status Conference* in all three (3) adversary proceedings (Adv. Proc. 03-00194, Docket No. 359). The Debtor in said motion calculated the accrued interest up to judgment date 08/31/2009 for the principal amount of the entire claim ($9,220,288.88) awarded in the PR-2 Mayaguez Project in the amount of $8,759,021.78 and the interest accrued from the post judgment date was calculated in the amount of $126,187.71 (Adv. Proc. 03-00194, Docket No. 359, pg. 5). The court notes that the pre-judgment interest and the post-judgment interest was calculated using the figure in the total amount of $9,220,288.88, which corresponds to the entire amount of the claim which was awarded to Redondo for the PR-2 Mayaguez Project, and said amount includes the claims of Lord and Remodelco.

On April 28, 2016, seven (7) days after the *Opinion and Order* of the court, Lord filed an *Urgent Motion Requesting Funds Be Not Disbursed* contending the following: (i) "Lord was one of the subcontractors for herein debtor in the PR-Mayaguez Project, for which the later filed Adversary Proceeding No. 03-00194 which included Lord's claim of $1,746,085.00, which was admitted by *Opinion and Order* dated August 31, 2009. In said *Opinion and Order* this Honorable Court granted prejudgment interests over the amounts allowed for each and every project to debtor;" (ii) Lord was paid the principal net amount owed after deductions of $1,395,381 on July 16, 2012; (iii) "[a]s the concession of interests was affirmed for all projects which included Lord's claim, there is pending payment of Lord's claim [for] interests, which Debtor's Attorney Charles Cuprill computed such interests owed in the amount of $1,336,799.03, which Lord accepted. See Exhibit 1 included as is pertained to Lord;" (iv) "[b]y Judgment entered by this Honorable Court on April 21, 2016, the disbursement of $9,923,567.43 to debtor was ordered. Such amount

includes Lord's participation in the interests of $1,336,799.03, according to attorney Cuprill's Memorandum to all parties for all projects concerned;" and (v) "[a] controversy has arisen between [D]ebtor and Lord, which makes Lord believe that if such money is disbursed to [D]ebtor, Lord will never be paid" (Adv. Proc. 03-00192[20], Docket No. 398). Attached to this motion is a memorandum dated April 22, 2016, from the Debtor's prior bankruptcy attorney regarding the *Opinion and Order* and Judgment rendered in Adversary Proceedings No. 03-00192; 03-00194; and 03-00195 and Distribution of Funds, particularly the interest component. The memorandum was addressed to Eng. Jorge Redondo; Arq. Miguel Redondo, Eng. Roberto Gorbea and Eng. Miguel Díaz. The memorandum provides the following:

> "I am forwarding copy of the Opinion and Order, and of the Judgment of reference both entered on April 21, 2016 (Exhibits 1 and 2). As it appears therefrom Redondo Construction Corporation ("RCC") has been adjudicated a total of $9,923,567.43, for pre and post-judgment interest on the principal previously awarded in the cases of reference of which $8,833,134.62 correspond to adversary no. 03-00194 (PR-2 Mayaguez) on the principal awarded in said case of $9,220,288.88.

> I am also forwarding copy of Eng. Roberto Arrieta's ("Arrieta") e-mail of July 19, 2015 to Arq. Miguel Redondo, together with Eng. Arrieta's prior analysis of the future payments that could be due to Continental Lord, Inc. ("Lord") and Remodelco, Inc. ("Remodelco") upon the award of interest, as part of Lord and Remodelco's awards of principal in the PR-2 Mayaguez case (Exhibit 3)[21].

> Considering the aforesaid, I requested from Luis A. Carrasquillo, CPA, CIRA, to proceed with the computation of Lord and Remodelco's participation in the $8,833,134.62 award of interest as to the PR-2 Mayaguez case, setting forth the percentage of their entitlement (Exhibit 4), which will also be applicable to the further computation of interest by the Clerk of the United States District Court for the District of Puerto Rico (the "Clerk") corresponding to the $,8833,134.62.

> We are in the process of coordination with the Clerk the issuance of the corresponding check and its retrieval by us, and suggest that upon its availability it be exchanged by the corresponding checks due to us, Lord and Remodelco, as illustrated in the attached computation" (03-00192, Docket No. 398, Exhibit Memorandum).

---

[20] The motion was only filed in adversary proceeding 03-00192, but it also pertains to adversary proceedings 03-00194 and 03-00195.

[21] Exhibits 1, 2, and 3 were not submitted to the Court (Adv. Proc. 03-00192, Docket No. 398-1).

The memorandum makes reference to several exhibits, however, Exhibit 4 was the only exhibit that was submitted to the court. Exhibit 4 disclosed a breakdown regarding the amounts paid in the PR-2 Mayaguez project to Redondo, Continental Lord and Remodelco and the percentages allocated to each party of said claim. According to the Exhibit, Lord's net claim before interests was in the amount of $1,580,085.00 (19.04%) and Remodelco's net claim before interests was in the amount of $77,389.20 (.93%). Redondo's net claim before interests was in the amount of $6,640,785.79 (80.03%). However, the net claim before interests did not factor in the amounts allocated to Lord and Remodelco for administrative expenses and the estimated pre-chapter 11 costs.

The interest component allocation that is disclosed in Exhibit 4, allocates $7,068,825.87 of the interest granted to Redondo, minus the legal costs in the amount of $706,882.59 for a net payment of $6,361,943.28 (81.94%). There is no deduction for administrative costs for Redondo. Lord's allocation of interest granted is in the amount of $1,681,931.34, minus $168,193.13 for legal costs and $176,939.18 for administrative costs, resulting in a net payment of $1,336,799.03 (17.22%). Remodelco's allocation of interest granted is in the amount of $82,377.42, minus $8,237.74 for legal costs and $8,666.10 for administrative costs, resulting in a net payment of $65,473.57 (.84%). This is the first scenario proposed by the Debtor regarding the interest component allocation to Lord and Remodelco (**scenario #1**).

Subsequently, on April 29, 2016, the Debtor filed an *Objection to Urgent Motion Requesting Funds Be Not Disbursed* by which it contends that: (i) "[o]n April 28, 2016, Continental Lord, Inc. ("Lord") filed an urgent motion (the "Urgent Motion") relative to adversary number 03-00194, stating that it was one of the subcontractors in the project corresponding to said case, as to which in the original opinion and judgment of this Court of April 31, 2009, was awarded a pass through claim for $1,746,085.00, the principal of which, after

deducting Lord's share of costs and attorney's fees, has been paid by RCC in excess, and now claims its share of the interest recently awarded by the Court to RCC, not Lord;" (ii) "[c]ontrary to Lord's assertions the computation of the interest which may be due [to] Lord was not made by the undersigned attorney but by Luis R. Carrasquillo, CPA on the basis of certain information provided by Eng. Roberto Arrieta, which is being revised to correct certain errors included therein, pertaining to what Lord is entitled to pursuant to the provisions of RCC's confirmed plan (the "Plan"), as supplemented on February 16, 2005 (the "Supplement");" (iii) "[t]here is no basis for Lord's assertion that if the funds awarded RCC, if disbursed thereto, 'Lord will never be paid.' RCC will pay Lord what Lord is entitled to pursuant to the Plan, as supplemented;" (iv) "[f]inally, as stated above, RCC will comply with its obligations to Lord pursuant to the provisions of the confirmed plan as supplemented, once the correct computation of the amount due [to] Lord is accomplished;" and (v) [t]o this effect, the Supplement provides in its footnote number 1 that Lord is entitled to a pass through claim from the recovery by Debtor in adversary number 03-00194 of 15%, less proportioned expenses. Once the correct amount is computed and RCC receives the funds awarded by this Court, RCC will fully comply with its obligations under the confirmed Plan (Docket No. 1017 in the main case, Exhibit A hereto)" (Adv. Proc. 03-00192, Docket No. 399).

On April 29, 2016 the court denied Lord's urgent motion, for the reasons stated by Plaintiff/Debtor which the court adopted. Moreover, the motion fails to plead with particularity the facts leading to its conclusory statements, and fails to include the legal basis for the same (Adv. Proc. 03-00194, Docket No. 400).

Also, on April 29, 2016, the Debtor's attorney Mohammad Saleh Yassin from the Law offices of attorney Cuprill drafted a memorandum dated April 29, 2016 directed to Eng. Jorge Redondo; Arq. Miguel Redondo and Charles A. Cuprill, Esq. regarding "requested information"

(Docket No. 2627, pg. 15). In this memo, the Debtor brings forth the1994 Liquidation Agreement, and the amended 2001 Liquidating Agreement and discusses the pertinent clauses pertaining to each agreement. This memorandum also discusses the January 14, 2005 letter sent by Eng. Roberto Gorbea from Lord to attorney Cuprill and the January 22, 2005, memorandum drafted by Eng. Arrieta and sent to Eng. Gorbea and Mr. Cuprill in response to Lord's letter. Thereafter, on February 17, 2005, a supplement to the First Amended Plan of reorganization was filed, stating that, "[a]s per an agreement of August 15, 1994, as amended, with Continental Lord, Inc. ("CLI"), [CLT] is entitled to a 15% pass through from the recovery by Debtor, less proportioned expenses." On July 11, 2012, Eng. Arrieta sent a memorandum to the Litigation Trust Board detailing the amounts to be paid (the "Distribution #3) corresponding to the awarded principal amounts regarding the claim pertaining to the PR-2 Mayaguez project. The court notes that Eng. Arrieta also copied the Debtor's attorney regarding his July 11, 2012 memorandum regarding Distribution #3. Distribution #3 was unanimously approved by the members of the Litigation Trust.

In this memo, the Debtor's attorney alleges that Lord's allocation of the principal award pursuant to the Supplement's 15% pass through language should have been the following:

Principal Awarded:     $1,390,603[22]
Less Legal Fees:        ($139,060)
Less Ch 11 expenses: ($123,781)
Less pre-Ch 11 expenses: ($22,500)
Net amount should be paid: $1,105,262

The Debtor's attorney also alleges in this memo that Lord received an excess payment of $292,119.00 under Distribution #3, which is the difference of $1,395,381.00 and $1,105,262.00[23] (Docket No. 2627, pg. 19). The memo also states that Remodelco's allocation of the principal

---

[22] It is 15% of the total claim, including the interest, for the PR-2 Mayaguez Project in the amount of $9,270,688.00.
[23] The court notes that there is a mathematical error in the computation. The difference between $1,395,381.00 and $1,105,262.00 is $290,119.00.

award under Distribution #3 (under the Separate Adjudication Clause) was $68,352.00 (net amount paid to Remodelco).

The memo further states that on April 21, 2016, an *Opinion and Order* was entered by which the lump sum amount of '$9,923,567.43, plus the interest accrued over said amount, less any applicable fees, in favor of RCC' (the 'Interest Award'). The portion of the Interest Award corresponding to the PR-2 Mayaguez project is $8,833,134.62. Eng. Arrieta indicated that the expenses between April 1, 2012 and June 30, 2015 were in the amount of **$728,268.54**. However, the summation of the administrative expenses under the first scenario adds up to $185,605.28 because there was no deduction for administrative costs in Redondo's interest component claim.

The Debtor's attorney **second scenario** regarding Lord's allocation for the Interest Award should be as follows:

> Principal awarded: $1,324,970.00 = (.15 x $8,833,134.62)
> Less legal fees: ($132,497.00)
> Less expenses: ($109,240.00) = (.15 x $728,268.54)
> Net amount to be paid: $1,083,233.00

Remodelco's allocation for the Interest Award should be as follows:

> Principal awarded: $82,377.00
> Less legal fees: ($8,237.00)
> Less expenses: ($432.00)
> Net amount to be paid: $73,708.00 (Docket No. 2627, pgs. 19 -20).

The Debtor, under the second scenario, did not provide a breakdown of Redondo's interest claim and how much was allocated to legal fees and administrative expenses. Following the Debtor's mathematical computation, Redondo's calculation for the net interest claim should be the following:

> Principal awarded: $7,425,787.62 = ($8,833,134.62- $1,324,970-$82,377)
> Less legal fees: $742,578.76
> Less expenses: $618,596.54 ($728,268.54 -$109,240-$432)
> Net amount to be paid: $6,064,612.32

The Debtor's **third scenario** is that "…Lord's claim for interest cannot be a payment made under the confirmed plan, as supplemented; either under Class 8 (which does not include payment of interest) nor a payment under an assumed contract (since the Pass Through Agreement was never listed in the Schedules, nor assumed by the Debtor according to the law" (Docket No. 2627, pgs. 4-5). The Debtor under the **third scenario** argues that the court should "… consider the footnote included in the Exhibit to the Supplement to the Plan as legally valid and binding, (which the Debtor disputes) Lord was overpaid in the amount of at least $592,358.82 due to a payment in error by the Litigation Trust Administrator, who did not follow the 2005 amendment to the Pass Through Agreement and the clear language of the footnote. See Exhibit 5 for Debtor's computation" (Docket No. 2627, pg. 4).  The Debtor's calculation of overpayment under the **third scenario** is based upon the following:

Construction Inefficiency………………......$1,767,742.33
Extra Work Orders Due to Inefficiency….. $991,080.53
Extended Overhead On-site Costs…………$1,887,706.18
Claim of Subcontractor (Lord)…………….$1,746,085.00
                                                                  $6,392,614.04
Profit…………………………………………   $639,261.40

Gross Award……………………………… $7,031,875.44

15% to Lord as per Liquidating Agreement….$1,054,781.2

Less 10% legal……………………………..$105,478.13

Sub-total……………………………………$949,303.18

Less Expenses ($123,781.00) ………………..$825,522.18

Less Other Costs ($22,500.00)………………..$803,022.18

Paid to Lord…………………………………$1,395,381.00

Overpayment to Lord………………………$592,358.82

The Debtor, under the **third scenario**, does not explain the reasoning for excluding certain line items from the total claim for the PR-2 Mayaguez Project. The line items that were excluded from the total amount of the claim were the following: the extra work orders for miscellaneous items and type X sidewalks in the amount of $306,594.79; the claim of Remodelco in the amount of $85,000.00; and the payment due on the original contract in the amount of $1,757,659.12 which was added after the calculation of the 10% profit of the total equitable adjustment (Adv. Proc. 03-00194, docket No. 342, pg. 7). Moreover, there was no allocation for the interest component generated from the monies deposited from the supersedeas bond by PRHTA. Under the **second scenario**, the Debtor proposed that the overpayment was based from the difference of the amount paid after deducting expenses ($1,395,381.00) and 15% of the total claim paid in the PR-2 Mayaguez project in the amount of $9,270,688.00 after deducting expenses which resulted in Lord having a claim in the amount of $1,105,262.00, and an alleged principal overpayment in the amount of $290,119.00.

The Debtor alleges that the doctrine of collection by mistake of what is not due ("cobro de lo indebido") is applicable to the instant case regarding the alleged overpayments regarding the principal of Lord's claim under **scenario 3**.

### *Doctrine of collection by mistake of what is not due ("cobro de lo indebido")*

The Debtor argues that the payment to Lord was made in error because it was overpaid by the Litigation Trust Administrator. The Debtor's argument is based upon the following: (i) "…the Litigation Trust Administrator and Lord failed to consider the January 14, 2005 agreement reaffirmed on January 22, 2005, as well as the footnote of the Supplement to the Plan, which limited any recovery by Lord only to 15% of the award and not to any specific amount granted for its claim as per the 2001 previous amendment;" (ii) "[t]he January 2005 agreement, prompted the Debtor to file, upon exigencies of Lord, a Supplement to the Confirmed Plan on February

-61-

2005, that included the footnote with the 15% agreed distribution;" and (iii) "[i]t is Debtor's position that should the Court consider the footnote included in the Exhibit to the Supplement to the Plan as legally valid and binding, (which the Debtor disputes) Lord was overpaid in the amount of $592,358.82, due to a payment in error by the Litigation Trust Administrator, who did not follow the 2005 amendment to the Pass Through Agreement and the clear language of the footnote for Debtor's computation" (Docket No. 2627, pgs. 3-4).

Article 1795 of the PR Civil Code, 31 L.P.R.A., §5121, provides that: "[i]f a thing is received when there was no right to claim it and which, through an error, has been unduly delivered, there arises an obligation to restore the same." Article 1800 of the PR Code, 31 L.P.R.A, §5126, provides in pertinent part that, "the proof of payment is incumbent upon the person who claims to have made the same. He shall also be obliged to prove the error under which he made it." Finally, article 1801 of the PR Code, 31 L.P.R.A, §5127 states the following: "[i]t is presumed that there was an error in payment when a thing was never owed or which was already paid for has been delivered, but the person from whom the returned is asked may prove that the delivery was made through liberality or for any other sufficient cause."

In Falcó v. Sucesión Suau, 18 P.R.R. 713, 912 (1912) the Supreme Court of Puerto Rico concluded that when a plaintiff initiates an action to recover what he had paid unduly, one of two scenarios would arise; namely; (i) if the defendant denies that he had received any amount, then the plaintiff is relieved of the burden of proving the error under which he or she made the undue payment; and (ii) if the defendant does not deny the receipt of any sum, but alleges that any amount that the defendant may have received was a due and just debt, then the plaintiff has the burden of proving the error under which he or she made the payment.

Thus, in the instant case, the Debtor has the burden of proving the error, given that there is no issue as to Lord receiving the payment for the principal amount of its claim. The Supreme

Court of Puerto Rico in <u>Arandes v. Baéz</u>, 20 D.P.R. 338 (1914) interpreted how this error may be proven, while distinguishing between an error of fact from one of law.

An "error of law" is defined by the Supreme Court of Puerto Rico "as the one in which the person who acts does not comply with the provisions of a current legal norm", <u>Sepulveda, v. Departamento de Salud</u>, 145 D.P.R. 560, 568 (1998). Specifically, in the context of the doctrine of collection by mistake of what is not due, an error of law is committed when one "makes a payment under the belief that it is required by law, either because of ignorance of the norm that discharges it from the payment, or by a misunderstanding of the applicable law." <u>Id.</u> A "factual error" or an error of fact occurs when a payment is made "based on facts that are not true. One must also understand that an error of fact was made when, even knowing the true facts, a merely formal or procedural error occurs; that is, what is popularly called a "human error" is committed," <u>Id.</u> The Supreme Court provides a mathematical error as an example of a factual error. <u>See</u> <u>E.L.A. v. Crespo Torres</u>, 180 D.P.R. 776, 794 (2011).

This distinction was important because only an error of fact gave rise to the application of the doctrine, with the necessary effect of imposing the duty on the defendant to return what he had mistakenly collected. <u>Aulet v. Depto. Servicios Sociales</u>, 129 D.P.R. 1 (1991). This holding was substantively modified in <u>E.L.A. v. Crespo Torres</u>, 180 D.P.R. 776 (2011). In <u>E.L.A. v. Crespo Torres</u>, the Supreme Court, following the manner in which Spain applied said doctrine, decided to completely abandon the distinction of a factual error from an error of law. Thus, subsequent to <u>ELA v. Crespo</u>, if a petitioner satisfies the three factors of the doctrine, it is immaterial if the error committed was one of fact or law for the obligation of restitution to arise. However, an error of fact or one of law still needs to be proven for the doctrine to apply, in addition to satisfying the other two prongs of the test. The test set forth in <u>Sepulveda, v. Departamento de Salud</u>, 145 D.P.R. 560, 568 (1998) and reaffirmed in <u>E.L.A. v. Crespo Torres</u>,

180 D.P.R. 776, 793-794 (2011) is as follows: (1) a payment is made with the intention of extinguishing an obligation; (2) the payment made does not have a just cause, that is, there is no legal obligation between the payer and the one who collects, or if the obligation exists, it is for a lesser amount than the amount paid, and (3) the payment was made by mistake and not by mere liberality or by any other concept.

All three requirements must be met. In this case, Redondo cites the three requirements that must be satisfied, but fails to apply all of them to the facts of this case. Redondo falls short in establishing whether a factual error or an error of law was made. The distinction may be less important now, but we cannot conclude that the Supreme Court intended to relieve the movant of his burden of proving the nature of the error that was made. The Debtor's argument regarding Lord's overpayment in the amount of $592,358.82 is allegedly due to a payment in error by the Debtor's Litigation Trust Administrator, who allegedly did not follow the 2005 amendment to the Liquidating Agreement and the clear language of the footnote for Debtor's computation. The alleged 2005 amendment to the 2001 Liquidating Agreement is disputed by Lord, and also the footnote's interpretation in the Exhibit regarding the Estate's causes of action is in controversy. Said footnote referenced the August 15, 1994 agreement, as amended. The court finds that if the error is one of law, the Debtor has not shown to this court how the excess payment was made under the belief that it was required by law, or by a misunderstanding of the applicable law. Redondo's argument for the alleged error is based on contract interpretation and an alleged amendment to the 2001 amendment to the Liquidating Agreement which is a different juridical concept.

Redondo fails to explain the basis for excluding certain line items from the total claim for the PR-2 Mayaguez Project. The line items that were excluded from the total amount of the claim were the following: the extra work orders for miscellaneous items and type X sidewalks in the

amount of $306,594.79; the claim of Remodelco in the amount of $85,000.00; and the payment

due on the original contract in the amount of $1,757,659.12 which was added after the calculation

of the 10% profit of the total equitable adjustment (Adv. Proc. 03-00194, docket No. 342, pg. 7).

There was no allocation for the interest component generated from the monies deposited from the

supersedeas bond by PRHTA. No explanation was given for these adjustments which decreased

the total amount the claim for the PR-2 Mayaguez Project. Therefore, this court finds that

Redondo did not satisfy its burden of proof in proving that an error was made in the payment of

the principal amount of Lord's subcontractor claim.

### *Interest allocation to Lord and Remodelco pass through claims*

The final issue before the court is the interest component in the three adversary

proceedings, which was the subject of substantial litigation regarding the determination of

whether the award of pre-judgment interest was appropriate; and if so, the basis of such award,

the applicable rate of interest and the periods of accrual. The bankruptcy court awarded Redondo

prejudgment interest on all damages at the rate of 6.5% per annum from June 30, 1996 in

adversary proceeding 03-00194. See In re Redondo Constr. Corp., 411 B.R. 89, 113 (Bankr.

D.P.R. 2009). In In re Redondo Constr. Corp., 678 F. 3d 115, 126 (1st Cir. 2012), the First Circuit

vacated the district court's judgment as to the award of prejudgment interest and the calculation

of extended overhead damages. The First Circuit concluded the following:

> "[a]t oral argument in this court and in a post-argument letter submitted pursuant to Federal
> Rule of Appellate Procedure 28(j), the debtor for the first time proposed two other possible
> bases for prejudgment interest. See P.R. Laws Ann. Tit. 31, §§3025, 4591. Neither of these
> statutes mentions prejudgment interest as such. Moreover, neither of them was cited to the
> bankruptcy court, and the debtor has offered no plausible reason to believe that the court
> awarded prejudgment interest under their aegis.
>
> The upshot is that uncertainty surrounds the debtor's putative entitlement to prejudgment
> interest, the source (if any) of that entitlement, the rate of interest (if any) that should be
> used, and the proper prejudgment period. Consequently, we have no principled choice but

to remand this case to the district court with instructions to vacate the award of prejudgment interest and return the case to the bankruptcy court for a determination of whether prejudgment interest is appropriate and, if so, at what rate and for what periods. We take no view as to the outcome of this further inquiry."

Upon remand to this court on the issue of prejudgment interest, an Opinion and Order was entered, appealed to the district court and ultimately the same was again appealed to the First Circuit. See Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 505 B.R. 388 (Bankr. D.P.R. 2014); affirmed by P.R. Highway & Transp. Auth. v. Redondo Constr. Corp.,523 B.R. 339, 2014 U.S. Dist. Lexis 157826 (D.P.R. 2014); vacated and remanded by In re Redondo Constr. Corp., 820 F. 3d 460 (1st Cir. 2016).

The First Circuit in In re Redondo Constr. Corp. held the following:

"[w]e, however, find little support for the bankruptcy and district courts' view that Article 1061 acts as a separate 'penalty' rather than compensation for delay based on the time value of money, and Redondo never develops its claim beyond a bare assertion. Finding no authority to the contrary, we must direct that the Article 1061 interest award be recalculated to take into account an award of postjudgment interest consistent with §1961's terms.

Although we find that Redondo is entitled to Article 1061 interest, we must vacate the district court's judgment to allow for an award of postjudgment interest consistent with 28 U.S.C. §1961 and a reduction of the Article 1061 interest award to the extent their accrual periods overlap. The parties are to bear their own costs." In re Redondo Constr. Corp., 820 F. 3d at 468-469.

The Debtor filed an *Urgent Motion for Calculation of Interest Due Redondo Construction Corporation and for Setting Aside Status Conference* requesting the court to enter an Opinion and Order and a judgment awarding the Debtor the interest specified in the amount of $9,982,695.52, on the principal of the original judgments plus the interest earned on those funds. In said motion, the Debtor included a table of the calculation of the pre and post petition interest due to the Debtor from the funds on deposit with the Clerk, following the mandate of the First Circuit. The table was divided by each of the three (3) projects. The PR-2 Mayaguez project was awarded the principal amount of $9,220,288.88 which was the basis for the interest calculation. The accrued interest up

-66-

to Judgment date was in the amount of $8,759,021.78 and the accrued interest post judgment was in the amount of $126,187.71, which adds up to the total interest due in the amount of $8,885,209.49. The court notes that the prejudgment and postjudgment interest for the PR-2 Mayaguez project were calculated based on the total amount of the principal awarded which includes the pass through claims or the subcontractor claims of Remodelco and Lord (Adv. Proc. 03-00194, Docket No. 359, pg. 5). On April 21, 2016, the Court entered an *Opinion and Order* and a *Judgment* regarding the interest, as to which both Redondo and the PRHTA have agreed to as to the amounts to be disbursed, and directed the following disbursements: (a) $9,923,567.43, plus the interest accrued over said amount, less any applicable fees, in favor of RCC; and (b) the remaining balance in favor of PRHTA (Adv. Proc. 03-0094, Docket Nos. 365 & 366).

This court has already discussed and concluded that Lord and Remodelco have pass through claims. The court also finds that the prejudgment and postjudgment interest calculated from the total principal awarded in the three (3) projects, which included the PR-2 Mayaguez project, constitutes part of the award or recovery to which Lord and Remodelco are entitled to from the principal amounts of its pass through claims, which formed part of the total principal amount for the PR-2 Mayaguez project, and from which the prejudgment and postjudgment interest were calculated.

The court notes that unlike the August 31, 2009 *Decision and Order* which included and itemized Lord and Remodelco's pass through claims as a component of the total principal awarded under the PR-2 Mayaguez Project claim, the subsequent Opinion and Orders that have dealt with the issue of prejudgment and postjudgment interest have calculated the interest using the total principal awarded by project. Thus, there is no specific allocation or itemization to the prejudgment and postjudgment interest pertaining to the subcontractor claims (Lord and Remodelco's pass through claims) which form part of the total principal awarded of the PR-2 Mayaguez project.

Lord argues that the computation that should be used for the interest calculation is the same one included in Attorney Cuprill's April 22, 2016 memorandum in which the suggested net distribution of interest to Lord was in the amount of $1,336,799.03 after deducting legal and administrative costs (Docket No. 2559, pgs. 15-16). The April 22, 2016 memorandum also included the interest portion for Remodelco in the net amount of $65,473.57 (Docket No. 2559-6). Lord argues that it has performed all its duties and obligations and is entitled to receive the full amount of the interest awarded by this Court on the principal amount of $1,746,085.00, less the agreed upon deductions.  However, on April 29, 2016, a memorandum from the Law Offices of Charles A. Cuprill was drafted regarding requested information and it was addressed to Eng. Jorge Redondo; Arq. Miguel Redondo and to Charles A, Cuprill, Esq. (Docket No. 2627, Exhibit 3). The memo discloses that the portion of the interest award corresponding to the project is in the amount of $8,833,134.62 and that Eng. Arrieta indicated that the expenses between April 1, 2012 and June 30, 2015 were in the amount of $728,268.54. In said memo, the attorney from the Law Offices of Charles A. Cuprill proposes that Lord's allocation of in the interest award based upon the "15% pass through from the recovery by Debtor, less proportioned expenses" should be as follows:

Principal awarded: $1,324,970.00
Less legal fees:    ($132,497.00)
Less expenses:    ($109,240.00)
Net amount to be paid: $1,083,233.00

The allocation of the interest award for Remodelco should be the following:

Principal awarded: $82,377.00
Less legal fees:    ($8,237.00)
Less expenses:    ($432.00)[24]
Net amount to be paid: $73,708.00

---

[24] The court notes that the allocation of expenses in the April 22, 2016 for Remodelco was in the amount of $8,666.10 and in the April 29, 2016 memo, the allocation of expenses is in the amount of $432.00, thus increasing Remodelco's net interest award from $65,473.57 to $73,708.00.

After considering the above findings, the court concludes that Lord and Remodelco are both entitled to their respective interest awards. However, the parties have not placed the court in a position to be able to determine the specific amount the interest award component should be. In the case of Lord, the Debtor has changed positions regarding both the principal amounts of the pass-through claim and the interest component that corresponds to Lord for its subcontractor claim. The footnote 1 that was included as part of the estate's claims and causes of action, in particular to the claim regarding the PR-2 Mayaguez, and which reads, "[a]s per an agreement of August 15, 1994, as amended, with Continental Lord, Inc. ("CLI"), CLI is entitled to a 15% pass through from the recovery by Debtor, less proportioned expenses," references the Liquidating Agreement of August 15, 1994, as amended.

Therefore, the parties must compute how the interest component must be distributed, "[a]s per the agreement of August 15, 1994, as amended, with Continental Lord, Inc. ("CLI"), CLI is entitled to a 15% pass through from the recovery by Debtor, less proportioned expenses," pursuant to the principles of contractual interpretation premised upon articles 1233- 1241of the PR Civil Code, 31 L.P.R.A. §§3141- 3479.

In the case for Remodelco's interest allocation, the only line item for which the Debtor presented two different figures was for the expense component. The court notes that the Debtor all throughout adversary proceeding 03-00194 represented not only to this court, but to the United States District Court for the District of Puerto Rico that it had standing to assert the subcontractor claims of Lord and Remodelco. The standing controversy was brought forth by the PRHTA which was the party that ultimately paid for the subcontractor claims and the interest component for the same. The issue of whether Redondo lacked standing to assert subcontractor claims was appealed to the First Circuit by the PRHTA along with three other legal issues or claims of error which are not pertinent to the instant case (Adv. Proc. 03-00194, Docket No. 240, pgs. 7-8). The First Circuit

-69-

regarding this particular issue affirmed the district court, concluding that the PRHTA forfeited its

Severin – based argument because it failed to raise the same as an affirmative defense. The First

Circuit Court concluded as follows:

> "[i]n an attempt to confess and avoid, the Authority suggests that it has not forfeited its challenge to the subcontractor-based damages because the challenge is purely legal in nature (see Appellant's Br. At 3). We reject this suggestion out of hand. Law-based arguments, like fact-based arguments, normally must be raised in the trial court, and (with possible exceptions not relevant here) failure to do so results in forfeiture. See, e.g., Martinez v. Colon, 54 F. 3d 980, 987 (1st Cir. 1995) (stating that legal theories not raised before trial court are subject to forfeiture).

> To the extent that the Authority invites us to overlook the forfeiture of its Severin argument to avoid "a miscarriage of justice," Appellant's Br. at 4, we decline its invitation. '[T]he Severin doctrine is an affirmative defense that must be raised by [the] defendant.' Northrop Grumman Computing Sys., Inc, v. United States, 99 Fed. Cl. 651, 659 (Fed. Cl. 2011). Our precedent is clear that a trial court normally commits no error- let alone plain error -when it fails to consider *sua sponte* an affirmative defense not seasonably raised at trial. See, e.g., Dimarco-Zappa v. Cabanillas, 238 F. 3d 25, 35 (1st Cir. 2001); Amcel Corp. v. Int'l Exec. Sales Inc., 170 F. 3d 32, 35 (1st Cir. 1999)" (Adv. Proc. 03-00194, Docket No. 240, pgs. 7-8); See also; Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 678 F. 3d 115, 121 (1st Cir. 2012).

The Debtor's arguments in its objection to Remodelco's interest payment are the following: (i) "[t]he record is devoid of any evidence or facts which would entitle Remodelco to receive a payment of 'interest' under the terms of the Confirmed Plan;' (ii) "Remodelco's alleged 'pass through claim,' which it alleges is the basis for the payment of 'interest' under the terms of the Confirmed Plan. Remodelco's alleged 'pass through claim' which it alleges is the basis for the payment of 'interest' is not even referenced in the Supplement to the First Amended Plan;" (iii) [t]he Confirmed Plan fails to include Remodelco as a creditor of the Debtor under any of the classes. Nor did Remodelco file a proof of claim against the Debtor;" and (iv) "[t]he Disclosure Statement and Confirmed Plan fail to mention the existence of any liquidating or pass-through agreement between the Debtor and Remodelco. Much less is there a motion to assume the same in the record of the case" (Docket No. 2644, pg. 2). The Debtor also argues that: (i) Remodelco

did not request any independent remedy to the Court in order to preserve any right it may have to the interest award; (ii) "[t]he Plan is devoid of any reference to any additional claim which Remodelco may have, subject to additional payment by the Debtor. Therefore, after confirmation, the Plan is what dictates the relationship between the parties. Hence, Remodelco does not have any right to receive any additional payment aside from that which was received (100% of the principal amount granted in the judgment, less proportionate expenses and costs)" (Dkt #2644, pgs. 6 & 9).

The court finds that the Debtor's arguments regarding Remodelco's interest allocation are inconsistent with the position it has sustained throughout the duration of the adversary proceeding in which it represented that it had standing to assert the subcontractor claims of Lord and Remodelco because the PRHTA waived its <u>Severin</u> affirmative defense. Remodelco did not file a proof claim and was not included as a creditor in any particular class under the amended plan. Moreover, there was no Liquidating Agreement between Remodelco and the Debtor that was submitted before the court. However, despite having all of these alleged shortcomings, the Debtor included Remodelco as a pass- through claimant in the complaint brought forth in the adversary proceeding, and when the funds regarding the principal amounts for the three projects were finally disbursed in July 2012, Remodelco received its payment as to the principal amount of its pass through claim. However, the Debtor nor the pass-through claimants received the prejudgment and postjudgment interest components pertaining to the principal amounts of their claims because that was a contested legal issue that was being litigated and finally became resolved on April 21, 2016. In the case of Remodelco, the parties need to clarify the expense component that should be deducted from the interest allocated to Remodelco. Under scenario 1, the expense component is in the amount of $8,666.10 resulting in a net interest payment of $65,473.57 and under scenario 2, the expense component is in the amount of $432, resulting in a net interest payment of $73,708.

Conclusion

For the reasons stated above, the court denies *Debtor's Position as to Overpayment to Lord Under the 15% Footnote Provision of the Supplement to Plan of Reorganization at Docket No. 1017* (Docket No. 2627) and grants in part and denies in part, Lord's *Opposition to Debtor's Position as to Alleged Overpayment Under the 15% Footnote Provision* (Docket No. 2629). The court denies Debtor's *Objection to Remodelco's Claim for Interest Payment* (Docket No. 2644). The court denies *Debtor's Renewed Objection to Reopening of the Case Upon Recent Arguments Presented by Lord at Dkt. 2643* (Docket No. 2645).

The court orders the parties to submit to the court within thirty (30) days, their respective computations regarding how the interest component should be distributed, "[a]s per the agreement of August 15, 1994, as amended, with Continental Lord, Inc. ("CLI"), CLI is entitled to a 15% pass through from the recovery by Debtor, less proportioned expenses," pursuant to the principles of contractual interpretation premised upon articles 1233- 1241of the PR Civil Code, 31 L.P.R.A. §§3141- 3479.

As to the interest allocation for Remodelco, the court orders the parties to submit within thirty (30) days, their respective computations on the amount of the expense that should be deducted from the interest that was allocated in the amount of $82,377.00.

SO ORDERED.

In San Juan, Puerto Rico, this 8th day of April, 2019.

Enrique S. Lamoutte
United States Bankruptcy Judge

-72-